**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF MISSISSIPPI**
**OXFORD DIVISION**

**ROGERS VANN, AS PERSONAL REPRESENTATIVE**
**AND ON BEHALF OF THE WRONGFUL DEATH**
**BENEFICIARIES OF JEREMY W. VANN**         **PLAINTIFF**

**VS.**         **CAUSE NO. 3:15-CV-063-MPM-SAA**

**CITY OF SOUTHAVEN AND**
**JORDAN JONES, JEFF LOGAN, BRETT YOAKUM, AND**
**TOM LONG, INDIVIDUALLY, AND**
**IN THEIR OFFICIAL CAPACITY AS POLICE OFFICERS,**
**AND CHIEF OF POLICE OF THE SOUUTHAVEN**
**POLICE DEPARTMENT**         **DEFENDANTS**

---

**DEFENDANTS' MEMORANDUM OF AUTHORITIES IN**
**SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

---

COMES NOW Defendants, City of Southaven, Mississippi and Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, individually, and in their official capacity as Southaven Police Officers (hereinafter collectively referred to as "Defendants"), by and through counsel, pursuant to Rule 56 of the Federal Rules of Civil Procedure, and respectfully submits this, its Memorandum of Authorities in Support of Its Motion For Summary Judgment. Defendants request that this Honorable Court enter summary judgment as to all claims because there are no genuine issues of material fact and Plaintiffs cannot establish the requirements for imposing liability against Defendants City of Southaven and Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, individually, and in their official capacity as Southaven Police Officers and Chief of Police.

## I.    PROCEDURAL HISTORY

Plaintiffs' Complaint was filed on April 23, 2015. *See Docket Entry 1*. Plaintiff Rogers Vann, as personal representative and on behalf of the wrongful death beneficiaries of Jeremy W. Vann, initially sued the City of Southaven for allegedly violating the decedent, Jeremy W. Vann's constitutional rights under the Fourth Amendments and 42 U.S.C. § 1983 related to the Southaven police department's use of deadly force on May 28, 2014. *See generally, Id*. Plaintiff amended his Complaint to name Officers Jordan Jones, Jeff Logan, Brett Yoakum, and Chief Tom Long individually and in their official capacity as police officers and Chief of Police of the Southaven Police Department.  *See Docket Entry 11*. Plaintiffs' two count Amended Complaint seeks to impose "§ 1983 Individual Liability for Unreasonable Seizure in Violation of the Fourth Amendment (Against Defendant Officers in their Personal Capacity)" and "§1983 Municipal Liability (Against the City of Southaven, and the Chief of Police)." *Id.*

## II.    FACTS

Plaintiffs' claims arise from a May 28, 2014 undercover drug operation, which occurred at the Big Lots parking lot near State Line Road and Highway 55 in Southaven, Mississippi. *See Docket Entry 11,* at ¶¶ 13-14. On Wednesday, May 28, 2014, Sgt. Brett Yoakum with the Special Investigations Division (SID) of the Southaven Police Department met with an informant who disclosed to Sgt. Yoakum he had arranged the purchase of an ounce of marijuana for $150.00 from an unknown source over the internet. *See Collective Exhibit "A[1]," at VANN.008; see also Docket Entry 11, at* ¶ 14. The Special Investigations Division prepared a Confidential Informant

---

[1] Collective Exhibit "A," includes the pertinent pages from the Mississippi Bureau of Investigation's *Report of Investigation*, a voluminous record with 245 pages of conclusory findings, statements from officers, witnesses, and suspects, pictures and evidence from incident processing, and subsequent chemical tests and analyses. Should the entire report need to be produced, Defendants will gladly furnish a copy. Collective Exhibit "A," further includes sworn Affidavits from Captain Peter T. Clinton of the MBI, Detective Kenneth Bryant, Detective Lance Sheppard, Sergeant Jeff Logan, and Lieutenant Jordan Jones.

2

packet and an Operation Plan, in which the detectives provided a "Description/Objective of Operation," which stated:

> An unknown black male has agreed to [s]ell C.I. (Confidential Informant) an ounce of marijuana for the purchase price of $150.00. C.I. contacted the suspect through a social media website "Mocospace." SID detectives are going to remain in contact with the C.I. until the suspect is positively identified. When the suspect is identified, Lieutenant Jordan Jones will give the command to stop the vehicle. SID Detective will then approached (sic) and stop the vehicle to conduct a narcotics investigation. The suspect is possibly driving a blue 2012 Honda Civic.

*See Id.*

Pursuant to Plaintiffs' Amended Complaint, Teon Katchens asked Jeremy Vann to drive him to the Big Lots on State Line Road from Memphis, Tennessee to deliver an ounce of marijuana. *See Docket Entry 11,* at ¶¶ 14-15. The two men left to deliver the marijuana with Teon Ketchen's three (3) year old child in the back seat. *See Docket Entry 11, at ¶ 19, and Exhibit "A," at VANN.010.* Meanwhile, at approximately 9:23 a.m., the arrest team positioned themselves in their unmarked vehicles in the Big Lots and nearby Goodwill parking lots under the supervision of Lt. Jordan Jones. *See Exhibit "A," at VANN.009.* As the vehicle driven by Jeremy Vann arrived at the Big Lots parking lot, the confidential informant contacted Teon Ketchens regarding the drug sale. *See Docket Entry 11, at ¶ 20, and Exhibit "A," at VANN.009.* After the confidential informant made it near the front entry of Big Lots, the right front seat passenger exited the vehicle and motioned the confidential informant toward him. *See Exhibit "A," at VANN.009.* Once the suspect vehicle was identified, Lt. Jones gave the command to "move in." *See Exhibit "A," at VANN.008*. The units advanced towards the suspect vehicle, with Det. Logan positioning his vehicle in front of the suspect vehicle, Lt. Jones positioning his vehicle 5-10 feet from the vehicle's passenger side front fender, and Det. Sheppard positioning his vehicle behind the suspect vehicle, effectively boxing in the suspect. *See Id. at VANN.020-*

*VANN.021, VANN.082, VANN.088, VANN.093, VANN.097, and VANN.101.* PlaintiffS then allege that the Southaven Police Officers, in plain clothes and not in uniform, approached the car brandishing guns without clearly identifying who they were. *See Docket Entry 11, at ¶ 21.* At this point, Jeremy Vann then attempted to flee.[2] *See Id. at ¶ 22.* Plaintiff then claims Sgt. Jeff Logan, in plain clothes, stepped in front of the vehicle and shot into the vehicle, before he was struck by the 1988 Honda Accord.[3] *See Id. at ¶ 22-23.* Lt. Jordan Jones also fired a shot at Jeremy Vann, striking the suspect. *See Id. at ¶ 23.* Jeremy Vann's injuries were fatal. *See Id.*

Following the incident, the Mississippi Bureau of Investigation (hereinafter referred to as "MBI"), an independent, third-party regulatory agency, conducted an exhaustive investigation of the events of May 28, 2014. *See generally, Exhibit "A."* After interviewing all available evidence, including testimony from all witnesses and each on-scene officer, the MBI, led by Captain Peter T. Clinton, and assisted by MBI Lt. Tim Douglas, MBI Lt. Charles Hale, and Det. Louie Hutchins with the DeSoto County Sheriff's Office, concluded:

> I have thoroughly reviewed the evidence and relevant material related to the above-mentioned **Police Officer Involved Shooting** that resulted in the death of **Jeremy W. Vann** on said date, time and location. I have with the same intensity reviewed the applicable law concerning the officers' use of deadly force as it related to Vann's criminal action(s). **To this end, I concluded with the highest degree of certainty that Lt. Jones and Sgt. Logan's "Use of Deadly Force" were in response to an apparent and immediate threat(s) of great bodily harm and/or death to Sgt. Logan and other arresting officers by Jeremy W. Vann.** These threats were set in motion by the felonious action of Vann when he intentionally struck multiple law enforcement officers' vehicles; and then he struck and injured Sgt. Logan with his 1988 Honda Accord as he attempted to avoid his arrest for the Possession of a Controlled Substance with Intent to Sell. **Therefore, Lt. Jones and Sgt. Logan's Use of Deadly Force to eliminate Vann's deadly threats/serious injuries to law enforcement officers were justified and no criminal charges will be filed or recommended by MBI.**

*See Exhibit "A," at VANN.007 (emphasis found in original).*

---

[2] Defendants deny this preferred version of the events.
[3] Defendants deny this preferred version of the events.

4

In postmortem toxicology, a sample of Jeremy Vann's chest blood was analyzed by NMS Labs on behalf of the Mississippi State Medical Examiner's Office. *See Exhibit "A," at VANN.200.* Jeremy Vann's chest blood sample tested positive for the following compounds: 42 ng/mL of Delta-9 THC, 100 ng/mL of Delta-9 Carboxy THC, and 7.0 ng/mL of 11-Hydroxy Delta-9 THC. *Id.* Per the NMS Labs' reference comments in the toxicology report, "11-Hydroxy Delta-9 THC is an active intermediate metabolite of tetrahydrocannabinol (THC), the active component of marijuana." *Id. at VANN.201.* NMS Labs continues to state, "[m]arijuana is a DEA Schedule I hallucinogen…[p]harmalogically, it has depressant and reality distorting effects." *Id.* Further explaining the results, NMS Labs notes, "Delta-9-THC is the principle psychoactive ingredient of marijuana/hashish. It rapidly leaves the blood, even during smoking, falling to below detectable hours within several hours." *Id.*

## II.   SUMMARY OF THE ARGUMENT

Defendants deny Plaintiffs' alleged version of the events, but there is no **genuine** dispute as to any **material fact** as it pertains to Defendants City of Southaven and Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, individually, and in their official capacity as a Southaven Police Officer, that defeats summary judgment. The Mississippi Bureau of Investigation "**concluded with the highest degree of certainty that Lt. Jones and Sgt. Logan's "Use of Deadly Force" were in response to an apparent and immediate threat(s) of great bodily harm and/or death to Sgt. Logan and other arresting officers by Jeremy W. Vann.**" *See Id. at VANN.007.* The Mississippi Bureau of Investigation further found, "[t]hese threats were set in motion by the felonious action of Vann when he intentionally struck multiple law enforcement officers' vehicles; and then he struck and injured Sgt. Logan with his 1988 Honda Accord as he attempted to avoid his arrest for the Possession of a Controlled Substance with Intent to Sell." *Id.*

5

Plaintiffs' claims that the decedent posed no immediate threat to the safety of the officers or others, or that the officers created any danger to themselves, are merely conclusory and unsubstantiated assertions contrary to numerous witness statements, physical damage to both the decedent's **and** officers' vehicles, and the subsequent hospitalization of Sgt. Jeff Logan. Therefore, Plaintiffs' claims against Defendant officers must fail as a matter of law.

Additionally, Plaintiffs have failed to establish the requirements for imposing liability against Defendants City of Southaven and Chief of Police Tom Long. Plaintiffs have made conclusory allegations without identifying any specific policies, practices, or customs that may even be argued to meet this stringent standard. With only a sweeping allegation, and certainly absent a showing of any pattern of violations, or a demonstration that the inadequacy of the training was so "obvious and obviously likely to result in a constitutional violation," or even a showing of one single incident of inadequate screening for hiring, supervision, discipline, or training, or any evidence whatsoever indicating failure to provide sufficient funding to do so, Plaintiffs' assertions are wholly deficient. As such, summary judgment on behalf of the Defendants is both appropriate and warranted.

### III.   STANDARD FOR SUMMARY JUDGMENT

As set forth above, Rule 56 of the Federal Rules of Civil Procedure authorizes summary judgment where "the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corporation v. Catrett,* 477 U.S. 317, 322, 91 L.Ed.2d 265, 106 S.Ct. 2548 (1986).  Similarly, the mere existence of a disputed factual issue does not foreclose summary judgment; rather, "the dispute must be genuine, and the facts must be material." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 91

L.Ed.2d 202, 106 S.Ct. 2505 (1986). Moreover, where "the summary judgment evidence establishes that one of the essential elements of the plaintiff's cause of action does not exist as a matter of law ... all other contested issues of fact are rendered immaterial." See *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552; see also *Topalian v. Ehrman,* 954 F.2d 1125, 1138 (5th Cir.1992).

Once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir.1978). In other words, "the nonmoving litigant is required to bring forward 'significant probative evidence' demonstrating the existence of a triable issue of fact." *In Re Municipal Bond Reporting Antitrust Lit.,* 672 F .2d 436, 440 (5th Cir.1982) (citations omitted). To defend against a proper summary judgment motion, one may not rely on mere denial of material facts nor on unsworn allegations in the pleadings or arguments and assertions in briefs or legal memoranda. Fed. R. Civ. Proc. 56(e). Rather, the nonmoving party's response, by affidavit or otherwise, must set forth specific facts showing that there is a genuine issue for trial. *Id*. In reviewing a motion for summary judgment, "all reasonable inferences are drawn in favor of the nonmoving party, **but** the nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.''" *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (emphasis added) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

In the context of a party asserting immunity in a summary judgment motion, "[t]he moving party is not required to meet its summary judgment burden for a claim of immunity. It is sufficient that the movant in good faith pleads that it is entitled to absolute or qualified immunity. Once the [movant] asserts this affirmative defense, the burden shifts to the plaintiff to rebut it." *Cousin v. Small*, 325 F.3d 627, 637 (5th Cir. 2003).

IV.    ARGUMENT

**Response to Count One of Plaintiffs' Amended Complaint:**

Plaintiffs seek §1983 liability for alleged unreasonable seizure in violation of the Fourth Amendment against Defendant Officers in their personal capacity. In response, Defendants show:

A.    ***Officers Jordan Jones, Jeff Logan, Brett Yoakum, and (To the Extent Applicable) Tom Long Are Entitled to Qualified Immunity As To Plaintiffs' Claims Against Them Because Their Actions Were Objectively Reasonable In Light of Clearly Established Law***

In *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982), the United States Supreme Court held that, pursuant to the doctrine of qualified immunity, government officials performing discretionary functions are shielded from "liability for civil damages insofar as their conduct did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818, 102 S. Ct. at 2738. The Court reasoned that such a rule was necessary to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.*

Qualified immunity strikes a balance between compensating those who have been injured by official conduct and protecting the government's ability to perform its traditional functions. *Wyatt v. Cole*, 504 U.S. 158, 167, 112 S. Ct. 1827, 1833 (1992). Accordingly, the U.S. Supreme Court has recognized qualified immunity for government officials where it was necessary to preserve their ability to serve the public good or to ensure that talented candidates were not deterred by the threat of damages suits from entering public service. *Id.* Qualified immunity is designed to shield from civil liability **all but the plainly incompetent or those who knowingly violate the law**. *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092, 1096, 89 L.Ed.2d 271 (1986); *Brady v. Fort Bend County*, 58 F.3d 173, 173-74 (5th Cir. 1995) (emphasis added). To

find that a state official is not entitled to qualified immunity, a court must find that the official's actions "were patently incompetent or intentionally flouted the law." *Brady*, 58 F.3d at 174.

On the morning of May 28, 2014, the vehicle driven by Jeremy Vann arrived at the Big Lots parking lot, and the confidential informant contacted Teon Ketchens regarding the drug sale. *See Docket Entry 11, at ¶ 20, and Exhibit "A," at VANN.009.* After the confidential informant made it near the front entry of Big Lots, the right front seat passenger of a Honda Accord exited the vehicle and motioned the confidential informant toward him. *See Exhibit "A," at VANN.009.* Once the suspect vehicle was identified, Lt. Jones gave the command to "move in." *See Exhibit "A," at VANN.008.* The units advanced toward the suspect vehicle, with Sgt. Logan positioning his vehicle in front of the suspect vehicle, Lt. Jones positioning his vehicle 5-10 feet from the vehicle's passenger side front fender, and Det. Sheppard positioning his vehicle behind the suspect vehicle, effectively boxing in the suspect. *See Id. at VANN.020-VANN.021, VANN.082, VANN.088, VANN.093, VANN.097, and VANN.101.*

Plaintiffs then allege that the Southaven Police Officers, in plain clothes and not in uniform, approached the car brandishing guns without clearly identifying who they were. *See Docket Entry 11, at ¶ 21.* However, indisputably, Det. Bryant and Det. Sheppard were both wearing bulletproof vest clearly labeled with POLICE, and Sgt. Logan and Lt. Jones were both wearing their police badges from their necks (*See Exhibit "A," at VANN.009, VANN.022, VANN.027, VANN.088, and VANN.103-VANN.104 (photos of POLICE vests worn by Det. Bryant and Det. Sheppard)); Lt. Jones said, "I began yelling POLICE, GET YOUR HANDS UP!" Id. at VANN.088.*; Sgt. Logan said, "I yelled that I was a police officer and ordered him to put his hands in the air." *Id. at VANN.082.*; Det. Sheppard said, "…I began to give loud verbal commands of, "POLICE, STOP!" *Id. at VANN.093.*; Det. Bryant said, "I heard officers yelling at

the driver, identifying themselves as police officers, and giving loud verbal commands to the driver to 'stop.'" *Id. at VANN.097*.; Det. Yoakum said, "… could hear SID Detectives yelling "Police." *Id. at VANN.101.;* witness Henry Myles said, "…heard police officers yelling 'Get Down! Police! Get Down!'" before he heard a shot, *Id. at VANN.*088.; and witness Lula Williams recalled hearing the police officers yelling from (sic) the suspect(s) to 'stop' or 'halt' before the shots were fired, *Id. at VANN.381.*. The driver was unequivocally aware he was approached by police officers. Indeed, the Mississippi Bureau of Investigation, an entirely independent and unaffiliated regulatory agency concluded in its investigative report, "**[a]fter narcotic officers moved in and blocked the path of Vann's Honda—and clearly identified themselves as "Police Officers…**," which clearly evidences that the officers identified themselves. *See Exhibit "A," at VANN.009* (emphasis in the original).

Plaintiffs also allege, "Jeremy Vann attempted to flee, however officer Jeff Logan in plain clothes stepped in front of the vehicle and shot into the vehicle, with apparent disregard to the minor in the back seat, shooting Jeremy Vann to prevent him from fleeing, all over an ounce of marijuana." *See Docket Entry 11, at ¶ 22*. Further, "Jeff Logan was then apparently struck by the vehicle and Lieutenant Jordon (sic) Jones then shot Jeremy Vann again. Both shots were fatal." *See Id. at ¶ 23*.

Contrary to those allegations, the Mississippi Bureau of Investigation conclusively reported:

> Vann attempted to avoid his arrest by placing his Honda in reverse and then he intentionally collided with Sgt. Sheppard's Ford F-150. Next, Vann accelerated forward and struck Sgt. Logan and then Vann struck Sgt. Logan's Chevrolet Avalanche. Then, Vann reversed his Honda Accord and struck Sgt. Sheppard's Ford F-150 for a second time. **Vann then again accelerated toward Sgt. Logan with a reckless disregard for human life. As a result, Sgt. Logan placed his hand on the hood of the recklessly moving Honda and fired a single shot from his duty weapon (9mm) through the Honda's windshield and in the**

**direction of Vann in order to eliminate Vann's deadly threat.** After being struck by a bullet from Sgt. Logan's firearm, Vann continued forward and struck Sgt. Logan with the front of his Honda Accord. Sgt. Logan rolled across the hood and fell to the pavement. Again, Vann reversed his Honda Accord and again struck Sgt. Sheppard's Ford F-150. **Afterward, Vann again accelerated his Honda Accord forward and in the direction of Sgt. Logan as he lay on the ground unable to move. As a result, Lt. Jones fired a single shot from his duty weapon (9mm) through the windshield and in the direction of Vann in order to prevent him from running over Sgt. Logan. Vann was struck by the bullet fired by Lt. Jones. Then, Vann's Honda Accord veered away from Sgt. Logan's head and rolled down the right side (of) Sgt. Logan's right arm.**

See Exhibit "A," at VANN.009-VANN.010 (emphasis in original); See also VANN.021-VANN.023 (photos indicating damage to the decedent's and officers' vehicles) and VANN.027.

In further support of the Mississippi Bureau of Investigations findings, Sgt. Logan, Lt. Jones, Sgt. Sheppard, Sgt. Bryant, Sgt. Yoakum, witness/confidential informant Altonious Selmon, witness Lula Williams, witness Dale Jennings, and witness Henry Miles provided corroborating statements. See VANN.082, VANN.088-VANN.089, VANN.093, VANN.097, VANN.101, VANN.106-VANN.107, and VANN.376.

Sgt. Logan's signed statement provides:

The decision was made to approach the suspect vehicle. I drove from the west side of the lot towards the vehicle. I turned south in order to stop directly in front of the suspect vehicle and block him in from the front. I saw Detective Lance Sheppard pull behind the suspect vehicle in order to block him in from the rear.

I exited my truck on the driver's side. As soon as I exited my truck the driver of the suspect car looked at me and I yelled that I was a police officer and ordered him to put his hands in the air. He put one hand on the steering wheel and his right hand went down where I couldn't see it. I pointed my weapon at him and ordered him to put his hands in the air. He did not comply and I heard the vehicle's engine rev up but the vehicle had not moved. I realized he was trying to put the car in gear. I moved down the side of my truck in order to not be in between my truck and the vehicle (sic). The driver was able to put the car in reverse. He backed the car into Detective Sheppard's truck. The (sic) then drove forward and hit my truck. He reversed again striking Detective Sheppard's truck. When he pulled forward the first time the car slightly turned as if going to head south. So I moved farther down my truck in a north direction. I assumed he would attempt to escape heading south because he had more room.

11

The entire time he was striking our vehicles I was yelling for him to stop the vehicle. I could hear the team yelling at him to stop as well.

The second time the suspect pulled forward he had created enough room to turn North and attempt to flee in the vehicle. I was standing beside my truck just past the driver's side passenger door. I was not able to move fast enough and was struck by the car and it pushed me into my truck. The suspect stopped and reversed the car. I then tried to run to the passenger side in order to not be struck a second time. The driver was able to pull forward faster than I could clear the car. I knew I was going to be struck again. I did not want the car striking me in the back for fear of being run over, so I turned and faced the car. I placed my left hand on the hood as it was about to hit me. At the same time I raised my weapon with my right hand and fired one round into the windshield at the direction of the driver. I saw the driver react to the round. I was hit by the car. I was on the hood and was spun around with my head facing towards the front of the car. I fell off on the driver's side. At the time I thought I was thrown clear of the car. I looked up and realized the front tire was going to hit me in the face. As I was putting my hands up to attempt to absorb the impact I heard a gunshot. At the time I did not know who fired a weapon. Immediately after hearing the gunshot the tire rolled past my head and I felt the tire roll down the side of my right arm.

*See Exhibit "A," at VANN.082-VANN.083.*

Sgt. Logan required transport to Baptist DeSoto Hospital for his injuries. *See Id. at VANN.010.*

Lt. Jones's signed statement provides:

As I exited my vehicle I observed the black male driver of the suspect vehicle turning to the left, right and rear. I recognized this behavior s he was looking for an escape route. I began yelling "POLICE" "GET YOUR HANDS UP." I heard Detective Logan and Detective Sheppard also yelling loud verbal commands. I then heard the suspect vehicles engine rev and the tires squeal as the vehicle began travelling in reverse. I observed the suspect vehicle strike Detective Sheppard's vehicle and come to a momentary stop. I heard the engine revving again and the vehicle lurched forward travelling toward Detective Logan and his vehicle. I saw Detective Logan moving trying to get out of the way of the vehicle and then the suspect struck Detective Logan's vehicle. I observed the vehicle then reverse again and strike Detective Sheppard's vehicle again with more force. I heard the engine rev again and the suspect vehicle sped forwards toward Detective Logan. I heard a "pop" and saw the driver physically react to being shot by Detective Logan. I then saw the vehicle strike Detective Logan and watched as he rolled across the hood. I observed the driver then working the shifter and steering wheel and watched as the vehicle sped off in reverse again, striking Detective Sheppard's vehicle even harder. I did not know it at the time, but the

12

vehicle speeding off in reverse had thrown Detective Logan off the hood and he was lying incapacitated on the pavement. The suspect vehicle's engine then revved again and the vehicle began quickly moving forward. I glanced to my right and saw Detective Logan lying on the ground. He was not moving. Detective Logan was lying in the path of the vehicle and I felt sure that he would be run over by the vehicle. I then fired one round from my Department issued 9mm handgun. I saw the driver physically react to being shot, and both his hands went to his right side. I believed this caused the vehicle to veer slightly to the right as the vehicle continued to move forward, but did not strike Detective Logan.

*See Exhibit "A," at VANN.088-VANN.089.*

Following the second fired shot, the slight veer of the vehicle likely saved the life of Sgt. Logan, as the vehicle changed path and veered away from Sgt. Logan's head and instead rolled down the side of Sgt. Logan's arm. *See Id. at VANN.010.* Prior to the vehicle coming to a stop, and as the Honda continued to roll, the Mississippi Bureau of Investigation found:

Vann exited the driver's door of his vehicle and fell to the pavement due to his multiple gunshot wounds. Then, Sgt. Yoakum administered first aid to Vann until the arrival of the Southaven Fire Department (SFD). Subsequently, Lt. Jones detained Teon Ketchens, right front seat passenger-Honda Accord. **Also, Sgt. Sheppard ran and stopped the runaway Honda Accord. During the safety clearing of the Honda, Sgt. Sheppard found a three year old child located in the left rear passenger seat-directly behind the driver's seat. Sgt. Sheppard assessed the child for injuries and found none.**

*See Id. (emphasis found in original).*

Plaintiffs' Amended Complaint alleges, "Decedent Jeremy Vann had a Constitutional right to be free from the use of excessive force and deadly force by Defendant Officers pursuant to the Fourth Amendment." *See Docket Entry 11,* at ¶ 31. Plaintiffs also claim, "[t]he conduct which resulted in a violation of Decedent's clearly established constitutional rights was the type of conduct that a reasonable person would have known violated those constitutional rights" *Id.* at ¶ 33.

Plaintiffs' claims are filed under 28 U.S.C. § 1983, which provides in relevant part as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …

42 U.S.C. § 1983.

It is well-recognized within the Fifth Circuit that, in order to succeed on a § 1983 excessive force claim, "a plaintiff must establish: '(1) **injury** (2) which **resulted directly and only from a use of force that was clearly excessive**, and (3) the **excessiveness of which was clearly unreasonable**.'" *Freeman v. Gore*, 483 F.3d 404, 416 (5th Cir. 2007) (emphasis added) (quoting *Tarver v. City of Edna*, 410 F.3d 745, 751 (5th Cir. 2005) and *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740 (5th Cir. 2000)); see also *Mace v. City of Palestine*, 333 F.3d 621, 624 (5th Cir. 2003) ("[a] plaintiff must prove injury suffered as a result of force that was objectively unreasonable.").

The United States Supreme Court held, "[t]he use of deadly force for apprehension is a seizure subject to the reasonableness requirement of the Fourth Amendment." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). The Court defined the circumstances under which the use of deadly force to stop a fleeing suspect is constitutionally reasonable in *Garner*, holding, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007) (quoting *Garner* at 11, 105 S.Ct. 1694).

Elaborating on the analysis found in *Garner,* the Supreme Court reexamined the issue in *Graham v. Connor,* holding, "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of

14

hindsight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). Critically, "[t]he calculus of reasonableness in these circumstances must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id. at 396-397.*

Plaintiffs' version of the events of May 28, 2014 vastly differs from the Mississippi Bureau of Investigation's report, and even the physical evidence found on the scene, including damage to both the decedent's vehicle and the officer's vehicles, and various eyewitness testimony. *See Exhibit "A," at VANN.007, VANN.009-VANN.010, VANN.021-VANN.023 (photos of damage to Plaintiff's and officers' vehicles), VANN.082, VANN.088-VANN.089, VANN.093, VANN.097, VANN.101, VANN.106-VANN.107, and VANN.376.* Defendants are acutely aware that in a motion for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. The nonmoving party, however, "'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'''" *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (emphasis added) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)). Defendants deny Plaintiffs' alleged version of the events, but there is no **genuine** dispute as to any **material fact** as it pertains to Defendants City of Southaven and Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, individually, and in their official capacity as Southaven Police Officers, that exists to defeat summary judgment.

In Plaintiffs' Amended Complaint, they contend, "the severity of the crime was low and the decedent posed no immediate threat to the safety of the officers or others." *See Docket Entry 11, at ¶ 34*. In respect to Plaintiffs' assertion that the severity of the crime was low, the Fifth

Circuit has held, "[t]he excessive force inquiry is confined to whether the [officer or another person] was in danger *at the moment of the threat* that resulted in the [officer's use of deadly force]." *Bazan v. Hidalgo Cnty.*, 246 F.3d 481, 493 (5th Cir.2001) (emphasis found in original) (citing *Fraire v. City of Arlington*, 957 F.2d 1268, 1276 (5th Cir.1992) ("[R]egardless of what had transpired up until the shooting itself, [the suspect's] movements gave the officer reason to believe, at that moment, that there was a threat of physical harm.")). In other words, the severity of the crime is irrelevant to the deadly force analysis, which must be "confined" to whether the officer was in danger "at the moment of the threat." *Id.*

Plaintiffs' unsubstantiated claims that "the decedent posed no immediate threat to the safety of the officers or others," and, "[a]ny danger to the officers was created by the officers themselves and the manner in which they operated the undercover operation," have no merit. *See Docket Entry 11, at ¶¶ 34-35.* An officer was struck and hospitalized due to the decedent's reckless disregard for human life. *See Exhibit "A," at VANN.010.* Plaintiffs further claim that, "[w]hen Defendant Officers fired their weapons, they did not have probable cause or reasonable suspicion to believe that Mr. Vann posed any threat of serious bodily harm to them or anyone else, other than the threat created by Jeff Logan, who in plain clothes attempted to step in front of the vehicle to prevent it from leaving," is nothing more than an unsubstantiated assertion. *See Docket Entry 11, at ¶ 40.*

The Mississippi Bureau of Investigation "**concluded with the highest degree of certainty that Lt. Jones and Sgt. Logan's "Use of Deadly Force" were in response to an apparent and immediate threat(s) of great bodily harm and/or death to Sgt. Logan and other arresting officers by Jeremy W. Vann.**" *See Id. at VANN.007. (emphasis found in original).* The Mississippi Bureau of Investigation further found, "[t]hese threats were set in

16

motion by the felonious action of Vann when he intentionally struck multiple law enforcement officers' vehicles; and then he struck and injured Sgt. Logan with his 1988 Honda Accord as he attempted to avoid his arrest for the Possession of a Controlled Substance with Intent to Sell." *Id.* Plaintiffs' claims that the decedent posed no immediate threat to the safety of the officers or others, or that any danger to the officers were created by the officers themselves, amount to nothing more than conclusory allegations and unsubstantiated assertions posited in the face of numerous witness statements, physical damage to both decedent's and officers' vehicles, and the subsequent hospitalization of Sgt. Jeff Logan.

The case at hand is analogous to the 2007 United States Court of Appeals, Fifth Circuit, case of *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007). In *Bazany*, Steven Bazany, an officer with the San Antonio Police Department, was providing security for the local City Hall, when he was informed of a possible gang altercation involving a silver Mustang. *Id.* Bazany spotted the men standing outside of the vehicle, and they quickly entered the vehicle and traveled through an intersection before Officer Bazany could motion for them to stop. *Id.* At that time, Bazany testified:

> Once the Mustang stopped, he reached a point approximately eight to ten feet
> from the front right corner of the Mustang, the vehicle suddenly accelerated
> towards him, turning first to the right, then back to the left, and then finally back
> towards the center of the roadway as Bazany attempted to get out of the way.
> When Bazany realized that he was not going to be able to get out of the
> Mustang's path, he decided to fire his weapon. The Mustang struck Bazany on the
> left leg, causing him to spin down the side of the vehicle. Bazany did fire his
> weapon, though he does not know whether he drew and fired before, during, or

immediately after he was struck by the Mustang. These events took place, on his

account, in the snap of a finger.

*Bazany at 316.*

The driver of the Mustang died from his wound, and his family filed a 42 U.S.C. § 1983 lawsuit against Bazany and the city of San Antonio under claims of excessive force and failure to train its police officers in the proper use of deadly force. *Id.* The *Bazany* Court looked to several cases as part of their review, including *Herman v. City of Shannon,* 296 F.Supp.2d 709 (N.D. Miss. 2003), in which two patrol cars surrounded a stopped vehicle and the officers exited with their guns drawn. *Id. at 711.* The truck then accelerated towards an officer standing three feet from the truck. *Id.* The officer was struck and fired two shots, injuring a passenger in the truck. *Id.* The Northern District Court found the response to be reasonable, given the officer's limited time to react to an evident threat and "our circuit's general acknowledgement that police officers are often required to make instantaneous decisions that ought not be second-guessed merely because other options appear plausible in hindsight." *Id. at 711-713.*

In *Bazany*, the Court followed this reasoning, holding, "[t]hat [the officer's] decision is now subject to second-guessing-even legitimate second guessing-does not make his actions objectively unreasonable given the particular circumstances of the shooting." *See Stroik v. Ponseti*, 35 F.3d 155, 158-159 (5th Cir. 1994) ("[W]e must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir.1992))). Just as the Courts in *Bazany* and *Herman* found the officer's actions to be objectively reasonable, the Defendants in the present case ask this Court to do the same. Lt.

18

Jones and Sgt. Logan's actions were "in response to an apparent and immediate threat(s) of great bodily harm and/or death to Sgt. Logan and other arresting officers by Jeremy W. Vann." *See Exhibit "A," at VANN.007 (emphasis redacted)*. Plaintiffs' contention that the decedent was merely fleeing is an unsubstantiated assertion.

Plaintiffs attempt to paint a picture of an unarmed driver, who was asked to help deliver an ounce of marijuana for a friend, prior to officers rushing the car without identifying who they are, and stepping in front of the vehicle to shoot and kill Jeremy W. Vann rather than to let him escape. *See generally Docket Entry 11*. Tragically, the decedent lost his life, but Plaintiffs cannot seek to hold Defendants liable on mere allegations contrary to all available evidence. Had Jeremy Vann simply attempted to escape, the case would be different. However, the **material** facts, that are not genuinely disputed, show a much different picture. On the morning of May 28, 2014, Jeremy W. Vann, while under the influence of active, hallucinogenic marijuana metabolites, agreed to drive Teon Ketchens and a three (3) year old child to make a drug deal. *See Exhibit "A," VANN.201-VANN.202 and Docket Entry 11, at ¶ 19*. Once the officers surrounded the vehicle to make a drug arrest, Jeremy Vann attempted to flee, striking multiple law enforcement officers' vehicles and striking and injuring Sgt. Logan. *See Exhibit "A," at VANN.007*. Plaintiffs assert Jeremy Vann was unarmed, but this is certainly not true. *See Docket Entry 11, at 16*. Vann attempted to use the Honda Accord as a 2,000 pound steel weapon, damaging multiple vehicles and nearly taking the life of Sgt. Logan. *Id.* Plaintiffs attempt to claim the officers fired shots with an apparent disregard to the minor in the back seat. *See Docket Entry 11, ¶ 22*. But it was the decedent, who was under the influence of marijuana and drove the minor to a drug deal, who brought the child into a deplorable situation, before attempting to use a vehicle as a battering ram and instrument of death in a desperate attempt to

escape. *See Exhibit "A," VANN007, VANN.201-VANN.202 and Docket Entry 11, at ¶ 19.* The officers on scene were unaware of the child present at the drug deal until Sgt. Sheppard was forced to jump in and stop the runaway vehicle before it entered a nearby road, at which time he first spotted the minor and luckily confirmed the child was uninjured. *See Exhibit "A," at VANN.010 and VANN.093.*

The **only** relevant issue in the qualified immunity analysis at hand is whether or not the Officers use of deadly force was reasonable. As discussed above, this analysis is confined to the "moment of the threat" and "must embody allowance for the fact that police officers are often forced to make split-second judgments-in circumstances that are tense, uncertain, and rapidly evolving." *See Bazan v. Hidalgo at 493 and Graham v. Connor at 396-397.* The "reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Further, "we must never allow the theoretical, sanitized world of our imagination to replace the dangerous and complex world that policemen face every day. What constitutes 'reasonable' action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure." *Stroik v. Ponseti*, 35 F.3d 155, 158-159 (5th Cir. 1994) (quoting *Smith v. Freland*, 954 F.2d 343, 347 (6th Cir.1992)). Defendants have established that the use of deadly force by Lt. Jones and Sgt. Logan was both reasonable and necessary in response to an immediate threat of great bodily harm and/or death to Sgt. Logan and the other officers. Therefore, there are no genuine disputes as to any material facts sufficient to defeat summary judgment, and the officers are appropriately entitled to qualified immunity.

**<u>Response to Count Two of Plaintiffs' Amended Complaint:</u>**

Plaintiffs next seek §1983 Municipal Liability against the City of Southaven and Chief Tom Long. In response, Defendants show:

> **B.     *Plaintiffs have Failed to Demonstrate the Requirements for Imposing Liability Against the Defendants under 42 U.S.C. § 1983***

In the landmark case of *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the United States Supreme Court expressly held that "Congress did not intend municipalities to be held liable unless action ***pursuant to official municipal policy*** of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036 (emphasis added).  The Court further concluded "that a municipality cannot be held liable *solely* because it employs a tortfeasor, or, in other words, ***a municipality cannot be held liable under § 1983 on a respondeat superior theory***." *Id.* (emphasis added); see also *Pembaur v. Cincinnati,* 475 U.S. 469, 479, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) ("[W]hile Congress never questioned its power to impose civil liability on municipalities for their own illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of others.").Through *Monell* and its progeny, the Supreme Court requires plaintiffs seeking to impose liability on a municipality pursuant to Section 1983 to identify a municipal "policy" or "custom" that caused the plaintiff's injury. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 403, 117 S.Ct. 1382, 1388 (1997).  The logic of this requirement has been expressed as follows:

> Locating a "policy" ensures that a municipality is held liable only for those deprivations resulting from the decisions of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality. Similarly, an act performed pursuant to a "custom" that has not been formally approved by an appropriate decisionmaker may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law.

*Bryan County*, 520 U.S. at 403-04, 117 S.Ct. at 1388 (citations omitted).

In order to impose municipal liability under § 1983, a plaintiff cannot merely identify conduct attributable to the municipality. *Bryan County*, 520 U.S. at 404, 117 S.Ct. at 1388. Rather, the plaintiff "must also demonstrate that, **through its deliberate conduct**, the municipality was the '**moving force**' behind the injury alleged." *Id*. (emphasis added). Put another way, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id*.

Plaintiffs in Section 1983 actions bear the burden of proving the existence of the municipal policy resulting in the alleged deprivation of a Constitutional right. *City of St. Louis v. Praprotnik,* 485 U.S. 112, 129, 108 S.Ct. 915, 926, 99 L.Ed.2d 107, 121; see also *C-1 by P-1 v. City of Horn Lake, Miss.*, 775 F. Supp. 940, 948 (N.D. Miss. 1990). Further, merely negligent conduct is insufficient to establish liability under Section 1983. *Newsom v. Stanciel*, 850 F. Supp. 507, 514 (N.D. Miss. 1994) (citing *Daniels v. Williams,* 474 U.S. 327, 338, 106 S.Ct. 662, 678, 88 L.Ed.2d 662 (1986); *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986)).

Plaintiffs' attempts to set forth a list of proposed "policies" (a)-(g) that they allege, in sweeping fashion, were both in effect and were the underlying cause of assumed constitutional violations. *See Docket Entry 11, at ¶ 47.* "*Monell's* rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989). "Only where a municipality's failure to train its employees in a relevant respect

evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983. *Id*. (quoting *Polk County v. Dodson*, 454 U.S. 312, 326 (1981).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Bryan County,* 520 U.S. at 410. Deliberate indifference requires a showing of more than negligence or even gross negligence. *City of Canton,* 489 U.S. at 388, 109 S.Ct. 1197; *Doe,* 15 F.3d at 453. "To satisfy the deliberate indifference prong, a plaintiff usually must demonstrate a pattern of violations and that the inadequacy of the training is 'obvious and obviously likely to result in a constitutional violation.'" *Cousin,* 325 F.3d at 637 (quoting *Thompson,* 245 F.3d at 459). Further, when a plaintiff alleges a failure to train or supervise, "the plaintiff must show that: (1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Smith v. Brenoettsy*, 158 F.3d 908, 911-12 (5th Cir.1998).

Plaintiffs have failed to meet his burden. Plaintiffs simply allege: **(a)** Failure to provide the City of SPD with sufficient funds for proper and adequate screening of potential employers; **(b)** Failing to properly reject applicants for positions as police officers, including Defendant Officers, when they failed to possess the proper qualifications and integrity to serve as law enforcement officials; **(c)** Failure to provide the SPD with sufficient funds for proper and adequate training of the new hires; **(d)** Failure to properly and adequately train the SPD's officers, including but not limited to: 1) apprehending suspects; 2) approaching vehicles in a tactical manner; 3) safely retrieving a suspect from a vehicle; 4) safe firearm deployment and

23

secure gun-handling; 5) undercover operations; 6) proper gun-handling technique to mitigate unwanted automatic-nervous-system responses to stress; 7) use of force; 8) use of deadly force; and 9) surveillance and video recording of sting operations; **(e)** Failure to properly and adequately supervise the SPD's officers, including but not limited to Defendant Officers, with respect to obvious law enforcement activities including those set forth in (d); **(f)** Failure to properly and adequately discipline or otherwise correct the misconduct of the involved SPD's officers, including but not limited to Defendant Officers; and **(g)** Failure to properly and adequately investigate the police misconduct of SPD's officers, including but not limited to Defendant Officers. *See Docket Entry 11, at ¶ 47*. These are conclusory allegations, and do not identify any specific policies, practices, or customs that may even be argued to meet this stringent standard. With only a sweeping allegation, and certainly absent a showing of any pattern of violations, or a demonstration that the inadequacy of the training was so "obvious and obviously likely to result in a constitutional violation," or even a showing of one single incident of inadequate screening for hiring, supervision, discipline, or training, or any evidence whatsoever indicating failure to provide sufficient funding to do so, Plaintiffs' assertions are wholly deficient to establish any municipal liability. *See Thompson*, 245 F.3d at 459. As such, summary judgment on behalf of the Defendants is both appropriate and warranted.

Rather than attempt to locate a City of Southaven official policy or custom, Plaintiffs want to undertake a proverbial "fishing expedition." Plaintiffs have failed to allege or show any official policy or custom attributable to the policymakers of the City of Southaven that, "through deliberate conduct," was the "moving force" behind the alleged violation of her constitutional rights. Instead, in the case at hand, the "threats were set in motion by the felonious action of Vann when he intentionally struck multiple law enforcement officers' vehicles." *See Exhibit*

24

*"A," at VANN.007.*

Further, Plaintiffs repeatedly accuse the Mississippi Bureau of Investigation of "fail[ing] to adequately investigate," this incident. *See Docket Entry 11, at ¶¶ 28 and 58.* Plaintiffs goes as far as to claim the Mississippi Bureau of Investigation "simply attempted to document a pre-determined conclusion: that the shooting was justified." *Id. at ¶ 58.* Defendants find no merit in such an unsubstantiated allegation. The Mississippi Bureau of Investigation is a third-party, regulatory agency, and the report was compiled through the diligent efforts of numerous officers and agents. *See Exhibit "A," at VANN.003.* The report itself is several hundred pages in length, and consists of hundreds of photographs, interviews, witness statements, and officer reports. *See generally, Exhibit "A."* Simply because an agency's investigative report does not conclude what a party wishes or believes to be true, does not render the report inadequate or improper in any way.

Plaintiffs have not demonstrated the requirements for imposing liability against the Defendants under 42 U.S.C. § 1983. Specifically, Plaintiffs have not demonstrated, nor can they, that any alleged deprivation of his Constitutional Rights was caused by or otherwise arose out of any policy or custom of the City of Southaven or the Southaven Police Department. Because Plaintiffs cannot establish any facts supporting the extension of liability to Defendants, City of Southaven, Mississippi and Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, individually, and in their official capacity as Southaven Police Officers, should be dismissed as a matter of law.

**C.**     ***The Claims Against Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, in Their Official Capacities as Southaven Police Officers, are Redundant and Should be Dismissed***

The claim against Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, in their official capacities as Southaven Police Officers should be dismissed as it is well-established that official capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035 (1978).  The Plaintiffs' suit versus both the City of Southaven and Officers Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long is redundant. Therefore, for the reasons above, the official capacity suit by the Plaintiff against Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, in their official capacities as Southaven Police Officers, should be dismissed.

**VIII.   Conclusion**

For the reasons set forth herein, as well as those contained in their underlying Motion for Summary Judgment, Defendants, City of Southaven, Mississippi and Jordan Jones, Jeff Logan, Brett Yoakum, and Tom Long, individually, and in their official capacity as Southaven Police Officers, respectfully request that the Court enter an Order granting them summary judgment as there are no genuine issues of material fact, thereby dismissing Plaintiffs' claims with prejudice, and further grant them any other relief to which they might be entitled.

Respectfully submitted, this the 18th day August, 2015.

By:*/s/ Robert E. Hayes, Jr.*
Robert E. Hayes, Jr. (MSB # 100717)
W. Doug Hollowell, III (MSB # 104538)
Attorneys for Defendants:
City of Southaven, MS & Jordan Jones, Jeff Logan,
Brett Yoakum, and Tom Long, individually, and in
their official capacity as Southaven Police Officers

OF COUNSEL:

HAYES LAW FIRM, PLLC
5740 Getwell Road
Building 9, Suite A
Southaven, Mississippi 38672
Telephone:  (662) 890-6909
Facsimile:    (662) 890-6928
robbie@rhayeslaw.com

## CERTIFICATE OF SERVICE

I, Robert E. Hayes, Jr., hereby certify that on the 18th   day of August, 2015, I electronically filed

the foregoing with the Clerk of the Court using the ECF system, which sent notification of such filing to

the following:

Daniel M. Czamanske, Jr., Esq.
Chapman, Lewis & Swan, PLLC
501 First Street
Post Office Box 428
Clarksdale, Mississippi 38614
dan@chapman-lewis-swan.com

*/s/ Robert E. Hayes, Jr.*
ROBERT E. HAYES, JR., ESQ