# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF MISSISSIPPI
### OXFORD DIVISION

ROGERS VANN, AS PERSONAL REPRESENTATIVE
AND ON BEHALF OF THE WRONGFUL DEATH
BENEFICIARIES OF JEREMY W. VANN                                    PLAINTIFF

V.                                                                          NO. 3:15CV63-M

CITY OF SOUTHAVEN AND JORDAN
JONES, JEFF LOGAN, BRETT YOAKUM, AND
TOM LONG, INDIVIDUALLY AND  IN THEIR
OFFICIAL CAPACITY AS POLICE OFFICERS
AND CHIEF OF POLICE OF THE SOUTHAVEN
POLICE DEPARTMENT                                                      DEFENDANTS

## ORDER

This cause comes before the court on the motion of defendants, pursuant to Fed. R. Civ.

P. 56, for summary judgment.  Plaintiff has responded in opposition to the motion, and the court,

having considered the memoranda and submissions of the parties, concludes that the motion is

well taken and should be granted.

This is a § 1983 action arising out of a May 28, 2014 police shooting which resulted in

the death of plaintiff's decedent, Jeremy Vann.  The defendants in this case are four members of

the Southaven police deparement, as well as the City of Southaven itself.

## FACTS

The shooting in this case occurred at the Big Lots parking lot near State Line Road and

Highway 55 in Southaven, Mississippi, as the defendant officers were attempting to arrest Vann

and his passenger, Teon Katchens, as part of an undercover drug sting operation.  At the time of

the shooting, Vann was driving Katchens from Memphis to Stateline Road, at Katchens' request,

1

in order to sell one ounce of marijuana to an individual who, unbeknownst to them, was acting as

a confidential informant for Southaven police.

In his brief, plaintiff describes the circumstances of the arrest in this case as follows:

The City of Southaven has adopted a program of using confidential informants
(who are prior arrestees) to create and solicit minor drug sales with non-residents
and offer them money to enter into their jurisdiction in an attempt to seize
property and increase the revenues from non-residents. The Decedent Jeremy
Vann was asked by his friend Teon Katchens for a ride to the border of
Southaven, Mississippi, from Memphis Tennessee. Neither Jeremy Vann nor his
friend had any weapons of any kind and apparently Teon Katchens had one ounce
of marijuana in his possession. A number of plain clothes officers in unmarked
vehicles who were not properly identified as police approached the vehicle
brandishing guns. Jeremy Vann attempted to flee from what appeared to be
civilians holding guns when one of the undercover officers, Jeff Logan, stepped in
front of the vehicle and shot Jeremy Vann. Officer Logan was then struck by the
vehicle and Lt. Jordan Jones shot Vann as well.

[Plaintiff's brief at 4].

For their part, the defendant officers deny that they failed to properly identify themselves

as police officers, and they emphasize that following the incident, the Mississippi Bureau of

Investigation ("MBI"), which they describe as "an independent, third-party regulatory agency,"

investigated the events of May 28, 2014 and concluded that the shooting was justified. In its

report, the MBI found that:

I have thoroughly reviewed the evidence and relevant material related to the
above-mentioned **Police Officer Involved Shooting** that resulted in the death of
**Jeremy W. Vann** on said date, time and location. I have with the same intensity
reviewed the applicable law concerning the officers' use of deadly force as it
related to Vann's criminal action(s). **To this end, I concluded with the highest
degree of certainty that Lt. Jones and Sgt. Logan's "Use of Deadly Force"
were in response to an apparent and immediate threat(s) of great bodily
harm and/or death to Sgt. Logan and other arresting officers by Jeremy W.
Vann.** These threats were set in motion by the felonious action of Vann when he
intentionally struck multiple law enforcement officers' vehicles; and then he
struck and injured Sgt. Logan with his 1988 Honda Accord as he attempted to
avoid his arrest for the Possession of a Controlled Substance with Intent to Sell.

**Therefore, Lt. Jones and Sgt. Logan's Use of Deadly Force to eliminate Vann's deadly threats/serious injuries to law enforcement officers were justified and no criminal charges will be filed or recommended by MBI.**

[MBI report at 7] (emphasis in original). Plaintiff concedes that, aside from this favorable report, "[a]fter an investigation both by the SPD and the Mississippi Bureau Investigation (MBI), the officers involved in the shooting received commendations for their actions." [Plaintiff's brief at 2].

The parties agree that two of the defendants, Detective Jeff Logan and Lt. Jordan Jones, fired the shots that killed Vann. In his deposition, Logan testified that he properly identified himself as a police officer and that, after he did so, Vann began crashing his vehicle against the police cars boxing him in, in order to escape. Detective Logan maintained in his deposition, however, that he did not actually point his weapon at Vann until his vehicle made physical contact with Logan's body. In their brief, defendants provide the following excerpts from Logan's deposition:

> Q. And describe for me what you remember him doing.
> A. I mean, it was all basically one time. It was really quick. I jumped out, yelling who I was.
> Q. What did you say exactly?
> A. Police Department.
> Q. All right. What did – and what were you doing physically? Were you – did you have a gun in your hand? Did you have a badge in your hand? What were you doing?
> A. The badge was hanging around my neck. I had a gun in my hand, but it was down, it wasn't pointed at him yet, yelling who I was. It was real brief.
> …
> Q. All right. So what's the next thing that – what's the next thing in your memory that occurs after you hear the gears grinding?
> A. He backs up into Detective Sheppard's vehicle.
> …
> Q. Well describe that for me. You get out of the vehicle and you draw your gun?
> A. Yes, sir.
> Q. When you draw your gun, what happens? You draw it up, or you draw it

down? Tell me how you draw it.

A. It's called low ready. Just basically when you draw it out, you just kind of keep it down to the ground. At this point I'm not pointing it at anybody.

Q. When did you first point it at anybody?

A. The first time he made contact with me.

Q. The first time he made contact with you?

A. Yes, sir.

Q. Not your vehicle, but with you?

A. Yes, sir.

…

Q. All right. When – what do you remember about the second impact with the Vann vehicle?

A. I remember – like from right before it hit me or as it hit me?

Q. Let's take it this way. You're – are you running I guess between your vehicle and the Jones vehicle? Are you walking? Describe it.

A. It's kind of a run. I'm not really a runner. I've had surgery. I was old. I wouldn't call it running, but I was going as fast as I could. You may call it a run, yes, sir.

Q. So you're going as fast as you can. What happens next?

A. I know – I mean, I'm at kind of like an angle. I can see this is – he's fixing to hit me and push me forward. So I turn and face him; and as a reaction, don't know why I did it, instead of two handed grip and shoot like you're supposed to, my left hand hit the hood of the car at the same time as I – I mean, it all happened at one time; and I fired one round into the windshield.

…

Q. All right. And you fired once?

A. Yes, sir.

Q. All right. Did you hit where you were aiming?

A. Yes, sir.

Q. And what happened after that?

A. The car hit me. I remember rolling over the hood and falling off to – on the driver's side.

…

Q. And where did you go from the hood, like which way did you –

A. (Interposing.) Rolled – at the time I thought I was thrown forward from the hood, but I couldn't say. I just remember going off the side of the car.

Q. Driver side or passenger side?

A. Driver side.

Q. Okay. And I know I saw a picture of your arm. What happened to your arm?

A. When I hit the ground, I thought the car had already gone past me; and it hadn't. So when I tried to roll, I saw the tire; and I just kind of gave it one of these (indicating), put my hands up because it was going to hit me in the face. When I did that, the tire rolled down my –

Q. (Interposing.) Your arm?

A. The outside of the tire rolled down my arm, yes, sir.

[Defendants' brief at 12-14].

In his deposition, Lt. Jones, who would ultimately fire the second round, testified that he only did so based on his belief that Detective Logan's life was in danger.  In their brief, defendants provide the following excerpts from Jones' deposition:

> Q. All right. Describe it for me.
> A. When I got out and I was in position one, my gun was down towards my side. As we started walking towards the vehicle and so did Detective Sheppard and Detective Logan, there was lights and sirens going off, we were yelling, Police, Get Your Hands Up. As soon as I got out, saw Mr. Vann start looking left, right, and behind him, actually saw him turn around in the seat and I recognized – I mean, I've been a cop for a long time. I recognized that he was looking for an avenue of escape, and then I – prior to getting to position two, he threw the vehicle in reverse and rammed Detective Sheppard's vehicle; and from that point forward my weapon was pointed at him.
> …
> Q. (Interposing.) I know, but you were saying – like, you were saying that at some point the Vann vehicle came in contact with Logan's vehicle, you saw that?
> A. Several times.
> Q. Several times. Did – was Logan's vehicle pushed, moved any distance?
> A. I would say yes.
>
> …
> Q. All right. When was the first – where was Detective Logan the first time you saw him in this – in this RIP?[1]
> A. The first time I saw Detective Logan, Mr. Vann had put the vehicle in reverse, had backed into Detective Sheppard's vehicle. Mr. Vann put the vehicle in drive and began rapidly moving forward towards what I now know is Detective Logan's vehicle parked here (indicating). I was not paying attention to that at the time.
> He started moving forward. I began tracking his vehicle. My weapon was pointed at Mr. Vann. His vehicle began moving forward; and I saw Detective Logan somewhere in this area, and I saw him moving very quickly to get out of the way of Mr. Vann's vehicle. That's the first time that I saw Detective Logan and realized that he was in some trouble right then.  …
> Q. All right. What about Detective Sheppard? What did you see him do?

---

[1]The term "RIP" is used here to refer to a takedown arrest.

A. I saw Detective Sheppard outside his vehicle with his vest on and yelling at the driver, you know, Police, Stop, Police, you know, Hands Up, whatever; and Detective Sheppard's weapon was pointed at the vehicle also.

…

Q. How many times did you see the Vann vehicle strike Logan's vehicle?

A. Two.

Q. How many times did you see the Vann vehicle strike Sheppard's vehicle?

A. Twice.

…

Q. All right. But you did see Detective Logan as he was falling on or actually on top of the hood?

A. I was – Mr. Vann was driving forward again.

Q. Right.

A. And I had my weapon pointed at him and was following him as he was driving forward, and out of my peripheral vision on the right I saw Detective Logan, like, launch into the air onto the hood and then roll off the vehicle as Mr. Vann put the vehicle in reverse.

Q. All right. Tell me the third time when – after the third time striking the Sheppard vehicle, is it going straight, right, left? What's it look like to you?

A. It appears it's going the exact same route that it took when it struck Detective Logan. I looked to my right. I saw Detective Logan lying on the ground incapacitated. His weapon was not in his hand, which is a bad sign if you have a police detective who does not have control of their weapon. Generally to me – or, to me that tells me that they're probably unconscious or in pain or there is – something is not right; and Detective Logan was lying in the path of the vehicle.

Q. All right.

A. It did not appear to me the vehicle had changed its course from the time it struck Detective Logan until the time it was coming towards him again.

…

Q. All right. So it's on this occasion after hitting the Sheppard vehicle for the third time that you discharged your weapon.

A. I did.

…

Q. Okay. That's fine. If Detective Logan had not been on the ground in the path of this vehicle, would you have shot—would you have shot into the vehicle?

(Objection to form)

A. No, sir.

[Defendants' brief at 10-12]. Detective Lance Sheppard, who was positioned directly behind Vann's vehicle, similarly testified that the vehicle "struck Detective Logan and his vehicle about simultaneously," and he asserted that the only reason he did not fire in order to protect Logan's

6

life was because "I had crossfire with Logan and Lt. Jones."[2]   [Sheppard depo. at 82].

For his part, plaintiff describes the shooting in this case as follows:

> Vann was not attempting to run anyone over, or at best it is a disputed fact
> issue as to whether he was attempting to run anyone over.  Vann was trying to
> break the gap; the officers recognized Vann was looking for an avenue of escape;
> and even Logan himself, figured out Vann was trying to get away;  "He did not
> smash me into the car or anything like that. He was more of just trying to – him
> trying to veer out, his car made contact with me."  It was clear Vann was
> attempting to flee.

> The only officer who was ever in the path of the Vehicle was Logan.
> Based on the configuration of the parking lot where the RIP took place, and the
> placement of the vehicles by the undercover narcotics officers, the only avenue or
> opening to escape was between Logan's vehicle and Jones' vehicle.   This is the
> opening that the Vann vehicle in fact went through before Sheppard jumped in it
> and braked it to a stop.  Officer Logan was in that opening when he shot Vann
> and was subsequently struck by the vehicle.  The disputed central fact is whether
> Logan ran to the opening and shot Vann to prevent him from fleeing, or whether
> Logan had run to the opening between the vehicles to get out of the way of the
> fleeing Vann.

[Plaintiff's brief at 6-7](record citations omitted).

Thus, plaintiff concedes that Logan was in the path of Vann's vehicle at the time of the

shooting and that he was, in fact, struck by it.[3]  Indeed, photographs from the scene show Officer

Logan lying on a stretcher, and he was treated at a local hospital for non-serious injuries.

Plaintiff maintains, however, that the "disputed central fact is whether Logan ran to the opening

and shot Vann to prevent him from fleeing, or whether  Logan had run to the opening between

the vehicles to get out of the way of the fleeing Vann."  Plaintiff contends that, if Logan is

---

[2]Defendant Det. Brett Yoakum testified that he had limited information to offer regarding the
incident, as he was tasked with keeping an eye on the confidential informant.

[3]As noted previously, plaintiff maintains that Logan was struck by the vehicle only after he fired
a shot, although Logan testified otherwise.

assumed to have moved in front of Vann's vehicle to block his escape (rather than to protect

himself), then this would render the shooting in this case unlawful under the Fourth Amendment.

Plaintiff argues in his brief that there is a second important factual dispute in this case,

namely whether the defendant police officers properly identified themselves as such. On this

issue, plaintiff writes in his brief as follows:

> The other significant disputed facts deal with the identification by the undercover officers to let Vann know that they were definitely the police and not someone else. The facts are that all officers involved were not in uniform; they were dressed as ordinary people. Some of the officers who were involved in the RIP were wearing police vests, but not the officers who shot Vann through the windshield, Jones and Logan. Jones was to the right or North and front of the Vann vehicle when he shot, and Logan was directly in front of the vehicle. Logan, the first to pull up and jump out, was wearing a red Star Wars t-shirt, khaki shorts, and tennis shoes. He believes he was wearing a badge around his neck, but the photograph does not show a badge and the affidavit of Teon, contradicts this as well. The Defense cites deposition testimony from numerous officers about the use of lights and sirens to identify the civilian dressed officers driving unmarked SUVs; however this is also a disputed fact. Teon did not see any lights or hear any sirens. The surveillance video which the Defendants have filed with this court shows the vehicles moving in, and even brake lights on Jordan's vehicle (no lights were on Long's vehicle) but no emergency or flashing lights can be seen on any of the undercover vehicles. Defendants also claim that they yelled "police" to Vann in the vehicle. It is certainly questionable whether simply yelling police is reasonable to notify Vann or anyone else that they are authentic police officers, but even that is disputed. Teon, did not hear anyone identify themselves as police before the shooting.

[Plaintiff's brief at 7](record citations omitted). Thus, plaintiff concedes that (as confirmed in

photographs from the scene) "[s]ome of the officers who were involved in the RIP were wearing

police vests, but not the officers who shot Vann through the windshield, Jones and Logan."

Plaintiff maintains that Katchens' assertion that officers failed to employ their police lights or to

verbally identify themselves serves to create genuine fact issues in this regard and gives rise to

potential liability under the Fourth Amendment.

## <u>ANALYSIS</u>

The court first considers the individual officers' motions for summary judgment, based on qualified immunity, in which they seek the dismissal of the excessive force claims against them.

To establish a Fourth Amendment violation based on allegations of excessive force, a plaintiff must prove: (1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable. *Elizondo v. Green*, 671 F.3d 506, 510 (5th Cir. 2012). In *Graham v. Connor*, 490 U.S. 386, 396, 109 S. Ct. 1865 (1989), the U.S. Supreme Court stated that the relevant factors for consideration on an excessive force claim include, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting or attempting to evade arrest by flight."

In considering the excessive force claims asserted against the defendant officers in their individual capacities, this court applies the Fifth Circuit's qualified immunity standard, which it has described as follows:

> This court applies a two-step analysis to determine whether a defendant is entitled to summary judgment on the basis of qualified immunity. First, we determine whether, viewing the summary judgment evidence in the light most favorable to the plaintiff, the defendant violated the plaintiff's constitutional rights. If the evidence viewed in the light most favorable to Appellees demonstrates that a constitutional violation occurred, "we next consider whether the defendant's actions were objectively unreasonable in light of clearly established law at the time of the conduct in question.

*Freeman v. Gore*, 483 F.3d 404, 410–11 (5th Cir. 2007). The Supreme Court has made it clear, however, that federal courts may consider the two prongs of the qualified immunity analysis in either order. As such, if a court concludes that the "clearly established" prong provides a clearer

9

basis for deciding the qualified immunity issue, then it may consider that prong first. *Pearson v. Callahan*, 555 U.S. 223, 226 (2009).

Part of the power of the qualified immunity doctrine arises from the fact that it must simply be raised as a defense by a defendant, and the plaintiff has the burden of establishing the proof and arguments necessary to overcome it. *See Pierce v. Smith*, 117 F.3d 866, 871–72 (5th Cir. 1997) (noting that the plaintiff bears the burden of demonstrating that an individual defendant is *not* entitled to qualified immunity). Once again, plaintiff's burden in this regard includes an obligation to demonstrate that the defendants violated "clearly established law" at the time of the conduct in question. The U.S. Supreme Court has made it clear just how heavy a burden this may be.

In *Plumhoff v. Rickard,* 134 S. Ct. 2012 (2014), the Supreme Court recently emphasized that:

> An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official violated a statutory or constitutional right that was " 'clearly established' " at the time of the challenged conduct. *Ashcroft v. al–Kidd*, 131 S. Ct. 2074, 2080, 179 L. Ed. 2d 1149 (2011). And a defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it. *Id.*, at 2083–2084. In other words, "existing precedent must have placed the statutory or constitutional question" confronted by the official "beyond debate." *Ibid.* In addition, "[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality," *id.*, at 2074, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.

*Plumhoff,* 134 S. Ct. at 2023. Thus, the U.S. Supreme Court has stressed that plaintiff's burden of demonstrating that defendants violated "clearly established law" requires not a citation to generalized principles of law, but, rather, specific authority which "placed the statutory or constitutional question" confronted by the official "beyond debate." *Id.*

Making the plaintiff's burden of producing relevant authority even more difficult, the

Supreme Court recently reiterated in *City and County of San Francisco v. Sheehan*, 135 S. Ct.

1765, 1778 (2015) that, to establish that the law in this regard was "clearly established," the

plaintiff must be able to cite either a decision from that Court or a "robust consensus of cases of

persuasive authority in the Courts of Appeals."  In another 2015 decision, the Supreme Court

similarly wrote that:

> No decision of this Court even discusses suicide screening or prevention
> protocols. And "to the extent that a 'robust consensus of cases of persuasive
> authority' " in the Courts of Appeals "could itself clearly establish the federal
> right respondent alleges," *City and County of San Francisco v. Sheehan*, 575 U.S.
> ——, ——, 135 S.Ct. 1765, 1779, —— L.Ed.2d —— (2015), the weight of that
> authority at the time of Barkes's death suggested that such a right did not exist.

*Taylor v. Barkes,* 135 S. Ct. 2042, 2044 (2015).  *See also Ashcroft v. al Kidd*, 563 U.S. 731,

742, 131 S. Ct. 2074, 2084 (2011).  Applying this standard, the Supreme Court in *Taylor*

unanimously concluded that the plaintiff had failed to produce the requisite showing of authority

and that dismissal based upon qualified immunity was in order.  *Id.*

As it has done repeatedly, the Supreme Court in *Taylor* emphasized that the precedent

which must be analyzed relates to that existing "at the time of [the plaintiff's decedent's] death."

*Id.*  This is particularly significant for this case, since the plaintiff here relies solely upon the

Sixth Circuit's decision in *Godawa v. Byrd*, 798 F.3d 457, 461 (6th Cir. 2015), which was not

decided until *after* the 2014 shooting in this case.[4]  That being the case, it represents no authority

---

[4]In his brief, plaintiff describes *Godawa* as follows:
> *Godawa v. Byrd*, 798 F. 3d 457 (6th  Cir. 2015) discusses the significance of an
> officer creating the threat of harm by moving toward the vehicle. In *Godawa*, a
> bicycle officer detains a minor who has an open container in his car and had been
> previously reported by a nearby business. The bicycle officer went to his bike to
> get something and the minor put his car in reverse and struck the officer's bicycle.

at all for the purposes of the qualified immunity motion.

Of course, even if the plaintiff had produced a single circuit court decision which had been decided at the time of Vann's death, this would clearly not suffice to establish a "robust consensus" of circuit court precedent. Moreover, the Supreme Court in *Taylor* also made clear that a plaintiff's failure to make the requisite showing of authority is itself sufficient reason to grant a qualified immunity motion, with no inquiry into the constitutionality of the defendant's conduct required. *Id.* It is thus clear that demonstrating a "robust consensus" of authority is a necessary precondition for a plaintiff to survive a qualified immunity motion (subject to an inapplicable exception discussed below), and this court sees no argument that the plaintiff has met his burden in this regard in this case.

Given his lack of helpful authority on point, it is perhaps understandable that plaintiff provides little discussion of the "clearly established" prong in his briefing. Moreover, the limited argument which plaintiff does provide runs directly counter to Supreme Court precedent. In his brief, plaintiff seeks once again to rely upon *Godawa* in this context, writing that:

> The Court in *Godawa* also addressed whether the right was clearly established at the time . . . and the Court noted, "It is clearly established law that the '[u]se of

---

The officer then ran to the front of the minor's vehicle and to the right and aimed his gun at the driver. The vehicle and officer came into contact, but precisely how was disputed. The Court noted it was, "difficult to discern whether the car was driving toward Defendant, whether the Defendant was moving toward the car, or both."

[Plaintiff's brief at 17]. This court can discern a number of important differences between this case and *Godawa*. In the court's view, there is much stronger evidence in this case than in *Godawa*, including testimony from multiple officers, that an officer's life was in genuine danger at the time Vann was shot. While this court regards this and other factors discussed in defendants' brief as greatly reducing the relevance of *Godawa*, it would be improper, in considering the "clearly established" prong, to even discuss a decision rendered after the relevant events in this case. This court will accordingly provide no further discussion of it.

deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable.'" *Id.* at 467, citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985).

[Plaintiff's brief at 17-18]. This argument runs directly contrary to admonitions from the Supreme Court against citing case law which is unduly broad and non-specific. While it is true enough that the Supreme Court in *Garner* made it clear that not all uses of deadly force to prevent escape are reasonable, this tells this court next to nothing about whether a police officer was given fair notice, through clearly established precedent, that a *particular* use of deadly force in a *particular case* was unreasonable.

It should be apparent that, if citing *Garner's* broad proposition were deemed legally sufficient, then this would meet the "clearly established" prong in most, if not all, cases involving uses of deadly force against fleeing suspects. Such is clearly not the Supreme Court's intent, as it has repeatedly made clear in decisions in this very factual context. In *Brosseau v. Haugen*, 543 U.S. 194, 200-01, 125 S. Ct. 596 (2004), for example, the Supreme Court considered a case where a police officer shot a suspect as he attempted to flee from law enforcement in his vehicle. In concluding that qualified immunity applied, the Supreme Court in *Brosseau* initially rejected the notion that vague citations to the Fourth Amendment excessive force standard served to provide "fair warning" to the police officer that her actions were unlawful. The Supreme Court observed that the Fourth Amendment principles set forth in *Garner* and *Graham v. Connor* were "cast at a high level of generality," and it reiterated its prior statement "that the right the official is alleged to have violated must have been 'clearly established' in a more particularized, and hence more relevant, sense: The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing

violates that right." *Id. citing Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034 (1987).


Thus, the plaintiff in this case has done exactly what the Supreme Court stated he should not do, namely rely upon the broad *Garner* standard in order to meet the "clearly established" prong of the qualified immunity test.  If there were any doubt that such is improper, it was removed by another recent Supreme Court decision.  In its 2014 decision in *Plumhoff*, the Supreme Court unanimously reversed the Sixth Circuit's ruling that the defendant police officers violated the Fourth Amendment in using deadly force, and it alternatively held that qualified immunity would exist regardless.  *Plumhoff*, 134 S. Ct. at 2016.  Given its clear relevance to this case, this court will quote from *Plumhoff* at considerable length.

In *Plumhoff*, which involved a fatal police shooting bearing considerable resemblance to the one in this case, the Supreme Court described the facts as follows:

> Near midnight on July 18, 2004, Lieutenant Joseph Forthman of the West Memphis, Arkansas, Police Department pulled over a white Honda Accord because the car had only one operating headlight. Donald Rickard was the driver of the Accord, and Kelly Allen was in the passenger seat. Forthman noticed an indentation, "roughly the size of a head or a basketball" in the windshield of the car.  Because Rickard failed to produce his driver's license upon request and appeared nervous, Forthman asked him to step out of the car.  Rather than comply with Forthman's request, Rickard sped away.
>
> Forthman gave chase and was soon joined by five other police cruisers driven by Sergeant Vance Plumhoff and Officers Jimmy Evans, Lance Ellis, Troy Galtelli, and John Gardner. The officers pursued Rickard east on Interstate 40 toward Memphis, Tennessee.  While on I–40, they attempted to stop Rickard using a "rolling roadblock," but they were unsuccessful.  The District Court described the vehicles as "swerving through traffic at high speeds," and respondent does not dispute that the cars attained speeds over 100 miles per hour.
>
> During the chase, Rickard and the officers passed more than two dozen vehicles. Rickard eventually exited I–40 in Memphis, and shortly afterward he made "a quick right turn," causing "contact [to] occu[r]" between his car and Evans' cruiser.  As a result of that contact, Rickard's car spun out into a parking lot and collided with Plumhoff's cruiser. Now in danger of being cornered,

Rickard put his car into reverse "in an attempt to escape." As he did so, Evans and Plumhoff got out of their cruisers and approached Rickard's car, and Evans, gun in hand, pounded on the passenger-side window. At that point, Rickard's car "made contact with" yet another police cruiser. Rickard's tires started spinning, and his car "was rocking back and forth," indicating that Rickard was using the accelerator even though his bumper was flush against a police cruiser.

At that point, Plumhoff fired three shots into Rickard's car. Rickard then "reversed in a 180 degree arc" and "maneuvered onto" another street, forcing Ellis to "step to his right to avoid the vehicle." As Rickard continued "fleeing down" that street, Gardner and Galtelli fired 12 shots toward Rickard's car, bringing the total number of shots fired during this incident to 15. Rickard then lost control of the car and crashed into a building. Rickard and Allen both died from some combination of gunshot wounds and injuries suffered in the crash that ended the chase.

*Plumhoff*, 134 S. Ct. at 2017-18.

Thus, much like this case, *Plumhoff* involved a fatal shooting of an individual initially stopped for suspicion of a non-violent crime which occurred in a parking lot after the suspect had collided with police vehicles attempting to "box him in." In the court's view, the facts of *Plumhoff* were in some respects more favorable to the plaintiff than this one, since the Supreme Court found that "[a]s Rickard continued 'fleeing down' that street, Gardner and Galtelli fired 12 shots toward Rickard's car, bringing the total number of shots fired during this incident to 15." Based on these facts, the Supreme Court's qualified immunity analysis in *Plumhoff* was as follows:

"[w]e have repeatedly told courts ... not to define clearly established law at a high level of generality," since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced. We think our decision in *Brosseau v. Haugen*, 543 U.S. 194, 125 S. Ct. 596, 160 L. Ed. 2d 583 (2004) ( per curiam ) squarely demonstrates that no clearly established law precluded petitioners' conduct at the time in question. In *Brosseau*, we held that a police officer did not violate clearly established law when she fired at a fleeing vehicle to prevent possible harm to "other officers on foot who [she] believed were in the immediate area, ... occupied vehicles in [the driver's] path[,] and ... any other citizens who might be in the area." . . .After surveying lower court decisions regarding the reasonableness of lethal force as a response to

vehicular flight, we observed that this is an area "in which the result depends very much on the facts of each case" and that the cases "by no means 'clearly establish[ed]' that [the officer's] conduct violated the Fourth Amendment." In reaching that conclusion, we held that *Garner* and *Graham*, which are "cast at a high level of generality," did not clearly establish that the officer's decision was unreasonable.

*Brosseau* makes plain that as of February 21, 1999—the date of the events at issue in that case—it was not clearly established that it was unconstitutional to shoot a fleeing driver to protect those whom his flight might endanger. We did not consider later decided cases because they "could not have given fair notice to [the officer]." To defeat immunity here, then, respondent must show at a minimum either (1) that the officers' conduct in this case was materially different from the conduct in Brosseau or (2) that between February 21, 1999, and July 18, 2004, there emerged either " 'controlling authority' " or a "robust 'consensus of cases of persuasive authority,' " that would alter our analysis of the qualified immunity question. Respondent has made neither showing.

*Id.* at 2022.

The Supreme Court in *Plumhoff* then proceeded to analyze the facts of the case and concluded that they were not materially distinguishable from *Brosseau* and that, indeed, they appeared more favorable for the defendant than in that case. Specifically, the Supreme Court in *Plumhoff* wrote that:

To begin, certain facts here are more favorable to the officers. In *Brosseau*, an officer on foot fired at a driver who had just begun to flee and who had not yet driven his car in a dangerous manner. In contrast, the officers here shot at Rickard to put an end to what had already been a lengthy, high-speed pursuit that indisputably posed a danger both to the officers involved and to any civilians who happened to be nearby. . . .

Since respondent cannot meaningfully distinguish *Brosseau*, her only option is to show that its analysis was out of date by 2004. Yet respondent has not pointed us to any case—let alone a controlling case or a robust consensus of cases—decided between 1999 and 2004 that could be said to have clearly established the unconstitutionality of using lethal force to end a high-speed car chase. And respondent receives no help on this front from the opinions below. The District Court cited only a single case decided between 1999 and 2004 that identified a possible constitutional violation by an officer who shot a fleeing driver, and the facts of that case—where a reasonable jury could have concluded that the suspect merely "accelerated to eighty to eighty-five miles per hour in a

16

seventy-miles-per-hour zone" and did not "engag[e] in any evasive maneuvers," *Vaughan v. Cox*, 343 F.3d 1323, 1330–1331 (C.A.11 2003)—bear little resemblance to those here.

*Id.* at 2024.

In this court's view, the facts of *Plumhoff* and certainly *Brosseau* were more favorable to the plaintiffs than this one, given the overwhelming evidence that the life of a police officer was in immediate danger when the fatal shots were fired in this case. Indeed, the Supreme Court observed in *Plumhoff* that, in *Brosseau*, the suspect "had just begun to flee and ... had not yet driven his car in a dangerous manner." *Id.* In this case, by contrast, there is objective evidence, including injuries to a police officer, supporting the officers' testimony that Vann had, in fact, been intentionally driving his vehicle in a dangerous manner at the time he was shot.

It is clear that plaintiff's burden in this case is to provide this court with authority decided before the 2014 shooting in this case which "clearly established" the illegality of the defendants' actions. Once again, plaintiff has submitted only a single (and, in this court's view, distinguishable) decision rendered by an appellate court *after* the relevant events of this case. That being the case, there is simply no question that plaintiff has failed to meet his burden of producing relevant authority and that the qualified immunity defense raised by defendants is due to be sustained on this basis.

That brings this court to an important exception to the general requirement that the plaintiff produce authority "clearly establishing" the illegality of the defendants' actions. While plaintiff has not argued for the applicability of the exception in his briefing, this court regards it as being a sufficiently important rule of law to address on its own motion. In electing to do so, this court recognizes that this case involves a fatal, and tragic, shooting, and it does not wish to

decide this case solely based on the lack of authority offered by plaintiff, without some inquiry into the facts of this case.

This exception to the general requirement of prior precedent arises from the Supreme Court's decision in *Hope v. Pelzer,* 536 U.S. 730 (2002). In *Hope*, the Supreme Court considered an Eighth Amendment claim in a case where prison guards handcuffed a prisoner to a hitching post on two occasions, one of which lasted for seven hours without regular water or bathroom breaks. Among other facts, the Supreme Court noted in *Hope* that "[a]t one point, a guard taunted him about his thirst." *Hope,* 536 U.S. at 738. Faced with these facts, six Supreme Court Justices concluded that the Eleventh Circuit erred in concluding that the defense of qualified immunity was available to the defendants. In so concluding, the Court observed that "[a]s the facts are alleged by Hope, the Eighth Amendment violations [are] obvious." *Id.* The Supreme Court reached this conclusion in spite of the fact that the plaintiff was unable to demonstrate federal appellate authority clearly establishing that it was unlawful to tie a prisoner to a hitching post.

In subsequent decisions, the Supreme Court has explained *Hope* as standing for the proposition that a failure to cite federal appellate authority supporting a claim may be excused in cases where the constitutional violation is "obvious." In *Brosseau,* for example, the Supreme Court wrote that:

> Of course, in an obvious case, these standards can "clearly establish" the answer, even without a body of relevant case law. *See Hope v. Pelzer*, 536 U.S. 730, 738, 122 S. Ct. 2508, 153 L. Ed. 2d 666 (2002) (noting in a case where the Eighth Amendment violation was "obvious" that there need not be a materially similar case for the right to be clearly established).

*Brosseau,* 543 U.S. at 199. The *Hope* exception thus constitutes a recognized, albeit

infrequently applied, exception to the general requirement that a plaintiff "clearly establish" the illegality of the defendants' conduct through the citation of then-existing federal appellate precedent.

In a January 2016 opinion in *Cooper v. Brown*, 2016 WL 142405, at *2 (N.D. Miss. Jan. 12, 2016), this court applied the *Hope* exception in a case which also happened to involve allegations of excessive force made against a police officer employed by a Desoto County municipality. In *Cooper*, this court denied the qualified immunity motion filed by a Horn Lake police officer, and indeed granted the plaintiff's motion for summary judgment on the issue of liability, in a case involving an attack upon a suspect by a police dog. In *Cooper*, this court found that the officer had allowed his dog to attack a defenseless suspect lying on the ground for up to two minutes, inflicting serious injuries in the process, in such a manner that any officer should have known to be unreasonable. *Cooper*, 2016 WL 142405, at *4-5.

In light of this finding, this court concluded in *Cooper* that the facts presented an "obvious" case within the meaning of *Hope* and that qualified immunity should be denied even though the plaintiff had only managed to cite a single circuit court decision in support of his allegation that the officer's conduct violated "clearly established" law. In so ruling, this court wrote that:

> The *Hope* exception is not frequently applied; indeed this court can not recall having done so in a prior case. Nevertheless, the court considers it to be a highly important exception to the exceedingly stringent showing of prior precedent which applies in most qualified immunity cases. Indeed, if this exception did not exist, then defendants might feel at liberty to engage in a wide variety of obviously unconstitutional conduct which had not yet been declared unlawful by a "robust consensus" of federal appellate authority. It also seems clear that there must be some mechanism for plaintiffs to "break through" the general requirement of prior precedent, lest the law end up essentially frozen in place, with little potential for development based on novel fact patterns or evolving law

enforcement practices.

*Id.* at *3.

While this court thus regards it as essential to recognize the *Hope* exception in appropriate circumstances, it does not regard this case as presenting such circumstances. Indeed, this court does not personally believe that the actions of the officers in this case were unreasonable at all, much less "obviously" so. In considering the officers' conduct in this case, this court first recognizes that, at the summary judgment stage, it should consider the facts in the light most favorable to plaintiff, as the non-moving party. The Supreme Court has recently emphasized that district courts are required to "draw[] inferences in favor of the nonmovant, even when, as here, a court decides only the clearly-established prong" of the qualified immunity standard. *Tolan v. Cotton*, 134 S. Ct. 1861, 1866, 188 L. Ed. 2d 895 (2014). At the same time, once a properly supported motion for summary judgment is presented, the nonmoving party must rebut with "significant probative" evidence. *Ferguson v. National Broadcasting Co., Inc.,* 584 F.2d 111, 114 (5th Cir. 1978). A "nonmoving party 'cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.''" *Id.* (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

Thus, this court is required to make reasonable factual inferences in favor of the plaintiff, but not fanciful or illogical ones. This court has previously noted that, in this case, plaintiff asks it to make two factual inferences in his favor, but this court finds only one of these inferences to be reasonable. As noted previously, plaintiff argues in his brief that "[t]he disputed central fact is whether Logan ran to the opening and shot Vann to prevent him from fleeing, or whether Logan had run to the opening between the vehicles to get out of the way of the fleeing Vann."

This court will accept as true plaintiff's contention that Detective Logan positioned himself in such a manner as to prevent Vann's escape, rather than, as Logan testified, as part of an effort to protect himself. While Logan denied that this was the case, plaintiff's argument to the contrary strikes this court as being within the range of reasonable inferences, given the circumstances of this case. Of course, it seems equally plausible that Detective Logan testified truthfully that his actions were motivated by a desire to protect himself, but, once again, this court is required to draw reasonable factual inferences in favor of the plaintiff. This court will therefore accept, for the purposes of this motion, plaintiff's assertion that Logan placed himself in front of Vann's vehicle to prevent him from escaping.

In assessing the reasonableness of Detective Logan's actions in placing himself in front of Vann's vehicle, it is first crucial to emphasize the circumstances which he faced at the time. As this court is writing this opinion, it has had the opportunity to consider these issues in the quiet and calm of the judicial chambers. Detective Logan did not have that luxury. To the contrary, Logan was faced with a suspect who, quite unexpectedly, began crashing his vehicle against police cars, with (at a minimum) reckless disregard for the safety of the officers involved. Clearly, Detective Logan's adrenalin would have been flowing in these circumstances, and he would have had very little time to decide on the proper course of action to take in response.

The Supreme Court has emphasized that "[t]he reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. Moreover, "[t]he calculus of reasonableness in these circumstances must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and

rapidly evolving—about the amount of force that is necessary in a particular situation." *Id. at 396-397.* This court believes that the Supreme Court had cases such as this one in mind when it wrote these words. That being the case, it seems quite improper for this court to do anything but give a great deal of deference to the split-second decisions which Detective Logan was forced to make when confronted with the chaotic events of this case.

Even disregarding the emergency situation facing Detective Logan, it is not at all clear to this court, even now, that he did anything other than his job duties required. It strikes this court that the natural inclination of good police officers, when they are faced with clearly unlawful conduct taking place before them, is to make an arrest. Plaintiff appears to contend that Logan should have essentially yielded to force and allowed Vann to make his escape once he escalated the situation by violently resisting arrest with a deadly weapon, namely his car. In the court's view, however, the orderly and efficient enforcement of the law allows police officers to reasonably presume that suspects will obey lawful orders to halt. It further seems likely that, if criminals came to believe that police officers would simply let them escape if they violently resisted arrest, that there would be many more suspects crashing their vehicles against police cars rather than quietly submitting to arrest. This court therefore does not regard the actions of the police officers in this case as being unreasonable, even when those actions are considered after the fact, in the calm of the judicial chambers.

That brings this court to the second factual inference which plaintiff would have this court make in his favor, namely that defendants failed to properly identify themselves as police officers in making their arrest. Once again, this court is only required to make reasonable factual inferences in favor of the plaintiff, and it has done so with regard to the issue of whether Officer

Logan's actions represented an attempt to "block" Vann's exit from the parking lot. As to the

identification issue, however, it strikes this court that the evidence is so overwhelmingly in favor

of defendants as to render plaintiff's requested inference unreasonable. As noted previously,

plaintiff concedes that "[s]ome of the officers who were involved in the RIP were wearing police

vests, but not the officers who shot Vann through the windshield, Jones and Logan." Obviously,

the act of wearing a police vest can only be regarded as an attempt to identify oneself as a police

officer, and it seems quite improper to ignore this fact merely because some of the involved

officers failed to wear such vests. When considering a group arrest conducted by multiple

officers, it strikes this court that the identification provided by all involved officers must be

considered.

Aside from the fact that plaintiff concedes that some identification was provided,

multiple officers have testified that they either verbally identified themselves as police officers

or that they had badges identifying themselves as such. In their brief, defendants summarize the

officers' testimony in this regard as follows:

> Detective Kenneth Bryant testified he initiated his lights as the officers
> approached the suspect vehicle. Det. Bryant further testified he was wearing a
> "throw-over" vest when he exited his vehicle. As the officers surrounded the
> vehicle, Detective Bryant heard "Police, Police, Let Me See Your Hands, stuff to
> that nature." Detective Brett Yoakum testified he was "almost positive" Lt. Jones
> had his (vest) on and was "pretty sure" (Det. Bryant) had his on as well. Det.
> Yoakum further testified he remembered Lt. Jones' vehicle had its emergency
> lights initiated but was unsure if any other vehicles had done the same. Det.
> Yoakum did note, very importantly, that he was tasked with keeping an eye on the
> confidential informant, and this kept him from witnessing much of the incident. Id
> Detective Lance Sheppard testified he was wearing a vest that said POLICE on
> both the front and back. Det. Sheppard also testified he turned on his lights as he
> pulled behind the suspect vehicle, and Lt. Jones initiated his lights as well.
> Further, Det. Sheppard, whose vehicle was located directly behind the suspect
> vehicle, testified a police vehicle in the convoy had initiated its siren, but could
> not recall which individual vehicle. Det. Sheppard remembers yelling "Police

Stop! Police Stop!" as Jeremy Vann struck his vehicle. Lt. Jones testified that both he and Det. Sheppard turned their sirens on and that both he and Det. Sheppard turned their lights on, but he was unsure about the others. Lt. Jones further testified he could remember everyone yelling "Police" and lights and sirens going off. Detective Jeff Logan testified he was wearing his police badge around his neck on a chain, and the badge was removed from him after he had been struck by the vehicle and was laying on the ground. Det. Logan's primary vehicle was in an accident prior to the date of the present incident, and his back-up vehicle was not equipped with lights or sirens, but he recalled hearing sirens from other vehicles in the convoy. Det. Logan further remembered he could see that Lt. Jones had initiated his emergency lights prior to Jeremy Vann's attempted fleeing. Det. Logan also testified he identified himself by yelling "Police Department!" as he exited his vehicle.

[Defendants' brief at 5-7](record citations omitted).

Thus, testimony from the officers involved overwhelmingly supports a conclusion that multiple police officers identified themselves as such. In considering this issue, this court must also recognize the fact that Katchens has seriously contradicted himself in his accounts of the relevant events. In his handwritten statement given shortly after the shooting, Katchens stated that:

I was on mocospace on May 28, 2014 @ around 6 a.m. using the name playamade2323 and I noticed that a man was saying do anyone near Memphis have an ounce so I messaged him and asked where was he and he said Southaven so I told Jeremy about it and he said we need to do that deal at first I thought it was some fishy but it was 150 dollars and Jeremy said he was gone do the deal and give me 50 dollars when Jeremy pull up he had the weed so by then I got my son and we headed to Southaven we got on the expressway and headed to Southaven so we called the man and asked where he was and he told us pull up on big lots when we get off on Stateline when we pulled up I waved him over to me but by then the police was coming from everywhere saying freeze and the siren on so I put my hands up but Jeremy hit the car in reverse then put it back in drive the police officer shot so I dipped then shot again so by that time I was focus on my son then I put my hands back up and got out of the car on the ground.

[Teon Katchens Statement]. In their brief, defendants emphasize that Katchens' video-taped interview with police was consistent with his written statement:

Further, in a nearly two hour long recorded interview with the Mississippi Bureau of Investigations, Teon refers to the Defendants as "the Police" throughout, and when asked directly if he believed Vann knew they were police officers, he stated, "he knew, well I think he knew… I told him, I said he done called the police on you!" Teon further claims he repeatedly told Jeremy to stop, and that he put his hands up once they were surrounded. Additionally, Teon corroborates his written statement that he heard the police officer command Vann to "Freeze!" Teon Katchens prepared affidavit, dated December 24, 2015, is entirely inconsistent with his original statements. On the date of the incident he stated he heard sirens, yet now he claims he did not. In his recorded interview he recalls stating that the buyer must have set them up with police, and now he "recalls" believing they were set up to be robbed. Teon's credibility and the proffered untimely affidavit's weight will be for this court to decide, but with all the remaining direct and corroborated evidence involved, Defendants firmly believe they serve no defeating purpose.

[Defendants' reply brief at 5].

As referenced by defendants, Katchens submitted an affidavit dated December 24th, 2015, in which he directly contradicts his earlier statement, in important respects. For example, Katchens asserts in paragraph 10 of his affidavit that "I did NOT see any flashing lights on either of the vehicles in front of us and I never heard a siren. I did not know the two men in front of us were police officers." Clearly, Katchens' assertion that he did not hear a siren is contrary to his prior statement that "the police was coming from everywhere saying freeze and the siren on." Moreover, Katchens' assertion that he did not know the men in front of him were police officers is contradicted by his earlier statement that he had told Vann "he done called the police on you!"

In the court's view, Katchens' earlier statement is far more consistent with the known facts of the case, as well as with the simple realities of police operations. Considering solely the undisputed facts, multiple individuals "boxed in" the suspect's vehicle with their own vehicles at the precise moment of an attempted drug transaction and emerged from their vehicles with guns drawn. This does not fit the profile of any realistic criminal scenario which this court can

imagine, and it strains credulity to believe that Vann and Katchens would not have known that they found themselves caught in an undercover police operation. This is certainly corroborated by Katchens' earlier statement that he knew that the police had been called, as well as by plaintiff's concession that some of the officers involved wore police vests. This court therefore finds Katchens' December 2015 affidavit to be contradicted by his own prior statements, as well as by common sense. Plaintiff relies almost entirely upon Katchens' highly suspect affidavit in support of his arguments on the identification issue, but this court does not regard his affidavit as properly serving as the basis for a reasonable factual inference on this issue.

This court therefore declines to apply the factual inference sought by plaintiff on the identification issue, but, as it happens, this factual dispute is essentially beside the point in this case. This is because plaintiff fails to offer even a single federal appellate decision which serves to "clearly establish" that the alleged actions of some (but not all) officers in failing to identify themselves violated the U.S. Constitution, under his version of the facts. Once again, this is an essential requirement of the qualified immunity doctrine, barring the application of *Hope*'s "obvious case" exception, which is clearly inapplicable here. Indeed, plaintiff has failed, as mentioned previously, to even argue the *Hope* exception in his briefing.

In reading plaintiff's brief, this court's overriding impression is that he diligently argued the facts of this case, although he conceded what this court regards as the most crucial fact: that Detective Logan found himself in the path of Vann's vehicle at the time of the shooting. That aside, it makes little difference, in the qualified immunity context, if a plaintiff effectively sets forth his version of the facts if he fails to support that version with federal appellate authority decided at the time of relevant events which establishes the illegality of the defendants' actions.

26

Even a cursory review of decisions such as *Brosseau*, *Plumhoff* and *Taylor* makes clear that "clearly establishing" the illegality of a particular defendant's alleged actions is the most difficult hurdle facing plaintiffs under the Supreme Court's present qualified immunity jurisprudence. This is a hurdle which plaintiff did not seriously attempt to surmount in his briefing in this case.

If there were any remaining doubt regarding the stringent manner in which the "clearly established" prong is to be applied, the Supreme Court made this point clear once again in yet another case (appealed from the Fifth Circuit) involving a police shooting of a fleeing suspect. *See Mullenix v. Luna*, 136 S. Ct. 305, 311, 193 L. Ed. 2d 255 (2015). In *Mullenix*, the Supreme Court found, as it had in prior decisions discussed above, that the plaintiff had done what the plaintiff in this case seeks to do: define the "clearly established" prong based upon generalized principles of law arising from the *Garner* standard. It strikes this court that the admonition against formulating the law in this manner constitutes one of the most frequently reaffirmed principles in the Supreme Court's § 1983 jurisprudence. It is thus clearly improper for plaintiff to seek to tread down this well-worn, and erroneous, path in this case.

This court recognizes that "clearly establishing" the law in this context may be a difficult hurdle for plaintiffs to surmount, and this fact has, time and again, led to the dismissal of § 1983 actions at the Supreme Court. Nevertheless, the Supreme Court could not have been more clear that the requirement for plaintiffs to "clearly establish" the law with relevant authority is a real one which district courts may not overlook. This court therefore has no choice but to apply this requirement in this case, and, having done so, there is no question whatsoever that plaintiff has failed to meet it. This is true even if plaintiff's requested inference regarding the identification

issue were (contrary to this court's conclusion) assumed to be reasonable.

This court notes for the record that not only has plaintiff failed to offer his own authority "clearly establishing" that the actions of the police officers was unconstitutional, but there is affirmative authority suggesting otherwise. Defendants rely upon the Fifth Circuit's decision in *Hathaway v. Bazany*, 507 F.3d 312 (5th Cir. 2007), which, like this case, involved an officer's decision to fire at a suspect whose vehicle seemed about to hit him. In rejecting the plaintiff's Fourth Amendment claims, the Fifth Circuit observed that:

> The evidence indicates that Bazany was in close proximity to a car that he had asked to pull over that then accelerated towards him, making perception of a serious threat reasonable. Given the extremely brief period of time an officer has to react to a perceived threat like this one, it is reasonable to do so with deadly force. It is this brevity, and the coordinate rapid response that it demanded from Bazany, that is the distinguishing factor in this case.

*Bazany*, 507 F.3d at 322. The Fifth Circuit has thus made it clear that, in situations where an officer feels threatened by an oncoming vehicle and has little time to react, courts owe a great deal of deference to that officer's decision regarding whether or not to fire his weapon. This is precisely the scenario present in this case, and this court agrees with defendants that *Bazany* supports their position in this case.

As a final point, the court notes that the allegation that some (but not all) police officers failed to identify themselves in the course of making a lawful arrest sounds in the sort of simple negligence which may not serve as a basis for recovery under the U.S. Constitution. The same could be said for Officer Logan's split-second decision regarding where to position himself relative to Vann's vehicle. While this court does not agree that any such negligence was present in this case, it believes that, giving the plaintiff the benefit of all factual inferences (both reasonable and unreasonable) in this case, negligence is the most which could reasonably be

alleged.

It is thus significant that the U.S. Supreme Court has made it clear that "injuries inflicted by governmental negligence are not addressed by the United States Constitution." *Daniels v. Williams*, 474 U.S. 327, 332, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). While *Daniels* involved the application of the substantive due process clause, federal appellate courts have applied its holding in the Fourth Amendment context as well. As stated by one federal appellate court, in a factual context very similar to that here:

> [T]he fact that an officer negligently gets himself into a dangerous situation will not make it unreasonable for him to use force to defend himself. The Fourth Amendment's "reasonableness" standard is not the same as the standard of "reasonable care" under tort law, and negligent acts do not incur constitutional liability. An officer may fail to exercise "reasonable care" as a matter of tort law yet still be a constitutionally "reasonable" officer. Thus, even if an officer negligently provokes a violent response, that negligent act will not transform an otherwise reasonable subsequent use of force into a Fourth Amendment violation. But if ... an officer intentionally or recklessly provokes a violent response, and the provocation is an independent constitutional violation, that provocation may render the officer's otherwise reasonable defensive use of force unreasonable as a matter of law. In such a case, the officer's initial unconstitutional provocation, which arises from intentional or reckless conduct rather than mere negligence, would proximately cause the subsequent application of deadly force.

*Billington v. Smith*, 292 F.3d 1177, 1190-91 (9th Cir. 2002), *citing Daniels*, 474 U.S. at 332–33.

This quotation strikes this court as being fully applicable to this case, since the plaintiff here is taking issue with the decisions made by police officers which led up to the critical moment when Detective Logan found himself in the path of Vann's oncoming vehicle. Having carefully considered the record in this case, this court does not believe that the defendants' actions in this case were "unreasonable" even in the negligence sense of the word. Even assuming one could disagree with this point, however, it seems clear to this court that the actions of the defendants were not "unreasonable" within the meaning of the Fourth Amendment. That

is the meaning which counts in the § 1983 context.

Moreover, it seems indisputably clear that plaintiff has failed to offer the sort of "robust consensus" of authority in support of his claims which might allow him to survive the individual defendants' qualified immunity motion. Indeed, plaintiff has failed to offer even a single decision which had been decided as of the date of the shooting in this case, and this is not the sort of "obvious" case which might make the *Hope* exception to this requirement applicable. Once again, plaintiff has not even argued otherwise, and this court has discussed the *Hope* issue purely in the interest of completeness. It may be that this court has given excessive discussion of *Hope*, given plaintiff's failure to argue the point. Nevertheless, this court recognizes, on a human level, the seriousness of the issues which arise from the undeniably tragic shooting in this case, and it wishes to fully discuss the legal issues arising from it. While this court has sympathy for Vann's family, it regards the relevant federal law as clearly favoring the individual defendants in this case. Their motions for summary judgment are therefore due to be granted.

That brings the court to the motion for summary judgment filed by the City of Southaven. Of course, the court's previously-stated conclusion that none of the defendant police officers violated the U.S. Constitution removes any possibility that it would conclude that the City itself might face liability for their actions. Moreover, while the City does not benefit from the qualified immunity doctrine's requirement that the plaintiff "clearly establish" the illegality of the defendants' actions through then-existing precedent, it has its own powerful legal card to play in this context. In *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 98 S. Ct. 2018 (1978), the U.S. Supreme Court held that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a

constitutional tort." *Monell*, 436 U.S. at 691, 98 S.Ct. at 2036. The Court further concluded "that a municipality cannot be held liable solely because it employs a tortfeasor, or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.*

The *Monell* doctrine thus makes it clear that, if one or more of Southaven's police officers could somehow be said to have acted unconstitutionally in this case, the City itself would not face liability for their actions unless it could be stated that they acted pursuant to a municipal "policy" or "custom." The Fourth Amendment claims in this case arise from the specific actions taken by Southaven police officers in response to totally unexpected provocations on the part of Vann in violently resisting arrest. In the court's view, none of the officers' actions in this regard violated the Fourth Amendment, but even if they could somehow be held to have done so, then plaintiff provides no valid arguments that they did so pursuant to a municipal policy or custom.

Apparently recognizing the difficultly he faces in arguing this point under the specific facts of this case, plaintiff seeks to rely on broader police techniques which were, at least arguably, made pursuant to a municipal policy or custom. In his brief, plaintiff writes as follows:

> The SPD has no written policy which reflects the method or scope for which CIs are to be used. Certainly, the general practice started out as a method of going up the crime or drug chain to catch bigger fish. But that is arguably not the policy or practice at the time of this incident. In this instance the CI is used to get "someone" or anyone to "come down" to Southaven to sell any amount of drugs even if it means offering them money to travel to that jurisdiction. Yoakum testified he is not aware of any written policies or procedures when it comes to dealing with CIs. When asked about offering to pay to have drugs brought to Southaven, he testified it was a common practice. He has done it before and other Sergeants do the same thing. In other words, it is a "widespread practice." RIPs are dangerous. Officers in plain clothes and unmarked cars, jump out with loaded guns, not knowing who is in the car (in this case, a 3-year-old child was one of the occupants) which created a dangerous and tense situation, all over what Jones describes as a minor transaction with an anonymous person. An amount of

marijuana that in some states you can buy legally. This practice by the SPD has
been changed following two incidents, including this one, in which Logan shot
into vehicles during RIPs.  Referring to the RIPs, Captain Stewart (who heads the
Narcotics division) testified, "...unless there is, you know, a significant, you
know, reason to do one, you know, I just don't really do them anymore just – we
do do them, but it's kind of like a case by case basis. We just don't do them on
every case that we can't identify somebody on."

[Plaintiff's brief at 22-23].

Plaintiff's arguments regarding municipal policy have a number of different aspects, but
none of them provide a basis for municipal liability in this case.  This court is aware of
controversy surrounding the practice of coercing drug suspects to serve as confidential
informants to catch "bigger fish," and there may well be a time and place where federal courts
will be required to consider constitutional issues arising from this practice (if they have not done
so already).  This case is not that time or place, however.

This cases arises from the specific actions taken by police officers in response to a
specific act of violent resistance by Vann.  In the court's view, the police actions which are
relevant to an assessment of the Fourth Amendment issues in this case include the issues
discussed previously in this opinion.  These issues include the manner in which police identified
themselves (or failed to do so) in this case and the manner in which they decided to employ
lethal force in response to Vann's provocations.  Once again, this court has concluded that
defendants' actions in this regard did not violate the Fourth Amendment, but it does not take
issue with plaintiff's basic decision to raise these issues, since they do bear, in a causation sense,
a reasonable relationship to the Fourth Amendment issues in this case.  As to the City, however,
plaintiff is unable to demonstrate that the specific actions by the defendant officers in arresting
Vann were made pursuant to a City policy, so he seeks to rely upon broader alleged policies,

which do not bear sufficient causal relationship to his claims.  While it may be true that the general police practices discussed above were a cause in fact of plaintiff's injuries, they are, in a proximate causation sense, unduly remote from those injuries to serve as a basis for the Fourth Amendment claim in this case.

Even if the court's causation concerns in this context are deemed unfounded, the fact remains that plaintiff offers no authority in support of his argument that the manner in which the City employs confidential informants or the manner in which it conducts RIP operations in general violates the Fourth Amendment. [5]  This court does not deny that plaintiff has raised some legitimate issues concerning the wisdom of some of the general police practices relating to the use of confidential informants, but these issues are hardly unique to this case or to the Southaven police department.  Moreover, the fact that a particular police practice may not be ideal does not mean that it constitutes a violation of the U.S. Constitution.  Given the widespread nature of many of the techniques employed in this case, it strikes this court that plaintiff would be able to offer this court a wealth of authority in support of his claims if these tactics had been held to be unlawful.  Once again, he offers no authority whatsoever on this issue, like so many others.

Plaintiff also argues that the City ratified the defendant officers' actions through a conclusory investigation, but this court finds, once again, that there was nothing unconstitutional about the officers' actions for which the City might incur liability.  Even if that were not the case, this court does not regard the City's investigation of the shooting as rendering its officers' actions its own within the meaning of *Monell*.  Plaintiff next argues that certain prior incidents

[5]Moreover, plaintiff makes reference to RIPs being conducted by "officers in plain clothes," without acknowledging that, as he has already conceded, some of the officers in this case wore police vests.

involving City officers establish "deliberate indifference" on the part of the City within the meaning of U.S. Supreme Court precedent. *See City of Canton v. Harris*, 109 S.Ct. 1197 (1997). In his briefing on this issue, however, plaintiff merely recites certain prior shooting incidents which allegedly took place, with insufficient indication that they bear a reasonable relationship to the facts of this case and/or that they had been found (such as by a federal court) to involve misconduct at all. This court therefore concludes that plaintiff's municipal liability arguments lack merit and are due to be denied. Having already sustained the individual defendants' qualified immunity motions, the court concludes that the summary judgment motion is due to be granted in its entirety.

It is therefore ordered that defendants' motion for summary judgment is granted.

A separate judgment will be entered this date, pursuant to Fed. R. Civ. P. 58.

So ordered, this, the 10th day of August, 2016

**/s/ MICHAEL P. MILLS**
**UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF MISSISSIPPI**